On Application for Rehearing
This court's opinion of April 18, 1997, is withdrawn, and the following is substituted therefor.
The appellant, Jason Roger Berryhill, was convicted of two counts of murder made capital (1) because the murder was committed *Page 299 
during the course of a burglary in the first degree, see §13A-5-40 (a) (4), Ala. Code 1975, and (2) because the murder was committed during the course of a robbery in the first degree, see § 13A-5-40 (a) (2). The jury recommended a sentence of life imprisonment without parole, and the trial court accepted the jury's recommendation.
 I.
Berryhill first contends that the trial court erred in allowing a state's witness, Stephanie Lynn Lee, to testify regarding statements the victim, Richard Willcutt, made to her in a telephone conversation on the day of Willcutt's death. Berryhill argues that the trial court erred in ruling that the statements were admissible under the res gestae and excited utterance exceptions to the hearsay rule.
Lee testified that she telephoned Willcutt's residence at around 3:30 p.m. on the day of the murder. The pertinent part of her ensuing testimony is as follows:
 "Q. [Prosecutor:] Okay, Stephanie. You had called Richard?
"A. Yes.
 "Q. And the phone was picked up at his end; is that correct?
"A. Uh-huh (yes).
"Q. Did you call him there at his trailer?
"A. Uh-huh (yes).
 "Q. And the phone was picked up but you were the first one that spoke?
"A. Yes, sir.
 "Q. All right. Was there some kind of pause or something on the other end? Is that why you spoke first? or was there a reason?
 "A. No. The only reason that — I am a very persistent person. I was just happy to get in touch with him, finally. I had been trying earlier that day and finally he answered the telephone and I just said, `Hey.'
"Q. Okay. And he said to you what?
"A. `Someone is in my house.'
"Q. Did he say anything else?
 "A. That was the first words out of his mouth. No. Not at the time, he didn't.
"Q. He said someone was in his house?
"A. (Nods head in the affirmative.)
"Q. What did [he] say after that?
 "A. He didn't say nothing directly after that. I picked up and said something after that.
"Q. Okay. Well, tell us what the conversation was.
 "A. Okay. He said, `Someone is in my house.' And I said, `What?' He said, `Someone is in my house.' And I said, `Richard,' I said, `you're crazy. There is someone in your house?' He said, `There is someone in my house.' I said, `Well, it's probably an animal or something up under the trailer. Why don't you go catch it?' He said, `There is someone in my house,' told me to hold on for a minute. When he got back on the phone, he said, `Can I call you back?' And I said, `Okay.' And that was the last thing I heard from him.
"Q. Did you hang up?
"A. Yes, I did.
"Q. Did he say anything about a gun?
"A. Yes, he did.
 "Q. All right. Tell us what he said about that during that conversation.
 "A. He said that he had a 9mm in his hand and he would blow them away if there was somebody in his house."
(R. 1426-28.) (Emphasis added.)
Lee went on to testify that an hour later she tried several times to telephone Willcutt, but the telephone line was busy each time she tried. Willcutt was discovered dead in his home later that evening, and the telephone was off the hook.
Berryhill contends that Lee's testimony concerning Willcutt's statements during the telephone conversation was inadmissible hearsay because, he says, the state did not establish that the statements were made at or around the time of the offense and that they were therefore part of the res gestae. He maintains that a hearsay statement itself *Page 300 
cannot be used to establish the res gestae. We find that Willcutt's statements qualified as excited utterances and that they were therefore admissible under that exception to the hearsay rule.
McElroy's Alabama Evidence provides:
 Generally, a person's statement concerning a startling occurrence made while perceiving the occurrence, or soon after perception thereof, and while the declarant is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule. This historic exception is continued under the Alabama Rules of Evidence by means of the following language found in Rule 803(2)[1]:
 "`Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial
 "`The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
"`. . . .
 "`(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'
 "This rule sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement: must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court.
 "Although a statement of this kind is nearly always referred to or described in the Alabama decisions as being a part of the res gestae, it is submitted that the terms `spontaneous exclamation' and `excited utterance' are preferable because the words `res gestae' have been used to signify so many different things that their use as calculated to promote confusion as to the proper scope of the present exception."
C. Gamble, McElroy's Alabama Evidence, § 265.01(1) at 1281(5th ed. 1996). (Emphasis added; footnotes omitted.)
It was not necessary for the state to first establish through some independent evidence that Willcutt's statements were made at or around the time of the crime for the statements to be admissible under the excited utterance exception. As Professor Gamble states:
 "Sometimes the only evidence that the startling event actually occurred is the excited utterance itself. The judicial consensus appears to be that the court may infer the happening of the startling event from the statement itself."
McElroy's Alabama Evidence, § 265.01(1) at 1282 (footnote omitted). See Advisory Committee's Notes to Rule 803(2), Fed.R.Evid. ("Whether proof of the startling event may be made by the statement itself is largely an academic question, since in most cases there is present at least circumstantial evidence that something of a startling nature must have occurred. . . . Nevertheless, on occasion the only evidence may be the content of the statement itself, and rulings that it may be sufficient are described as `increasing' . . . and as the `prevailing practice.'") (citations omitted); and Bourjaily v. United States,483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (holding that a hearsay statement can itself be considered in first determining if a conspiracy existed when the statement was made). *Page 301 
"The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court." O'Cain v. State, 586 So.2d 34, 38 (Ala.Cr.App. 1991). We find no error in the admission of Willcutt's statements; the circumstances indicated that the statements were made while Willcutt was under the stress of a nervous excitement created by the perception that an intruder was in his home.
 II.
Berryhill next contends that the trial court erred in not allowing him to introduce the entire statement Willcutt allegedly made to Angela Faye Franks in a telephone conversation that took place around 4:15 to 4:30 p.m. on the day of the murder. In that conversation, Willcutt allegedly told Franks that he had just returned from procuring a new supply of marijuana. The prosecutor argued that the statement was inadmissible hearsay. Although the trial court allowed Franks to testify that Willcutt had stated that he had just gotten back from "picking up some stuff," the court, sustaining the prosecutor's hearsay objection, ruled that Franks could not testify that Willcutt stated that he had picked up a supply of marijuana. Berryhill argues that the entire statement was admissible under the res gestae exception to the hearsay rule.
Berryhill maintains that the admission of Willcutt's statement concerning the marijuana was necessary "to complete the unfinished picture" created by other evidence adduced at trial. (Brief of appellant at 38.) There was testimony that investigators did not discover any marijuana in Willcutt's residence following his murder and that Berryhill had no marijuana in his possession after the crime. Thus, says Berryhill, evidence that shortly before his death Willcutt had procured a supply of marijuana and that no marijuana was found in his trailer, would be consistent with a theory that someone other than Berryhill went to Willcutt's residence on the day of the murder, killed Willcutt, and took the marijuana.
Notwithstanding Berryhill's argument, we find that the trial court properly sustained the prosecutor's hearsay objection to the proffered evidence, because the circumstances failed to suggest that Willcutt's statement was "the apparently spontaneous product of [an] occurrence operating upon the visual, auditory, or other perceptive sense of the speaker." McElroy's AlabamaEvidence, § 265.01(1) at 1281 (noting that the res gestae exception to the hearsay rule is more properly viewed as the "spontaneous exclamation" exception or the "excited utterance" exception; see Part I of this opinion). Neither did the facts indicate that Willcutt's statement was made "at such time and under such circumstances as to be part of the transaction which they purport to explain." Lovett v. State, 491 So.2d 1034, 1036
(Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala. 1986) (discussing the standard for the admissibility of statements of homicide victims under the res gestae exception to the hearsay rule). The trial court did not abuse its discretion in disallowing the testimony concerning Willcutt's statement.
 III.
Berryhill next contends that the trial court erred in failing to grant his motion for a mistrial when, during jury selection, a prospective juror expressed his opinion as to Berryhill's guilt in the presence of the jury venire.
During voir dire, Berryhill's counsel asked the entire venire questions regarding the members' ability to remain impartial when hearing testimony or other evidence regarding drugs, drug possession, or drug use and whether they would be able to serve on a jury for an extended period. In response to these questions, the following exchange took place between Berryhill's counsel and the prospective juror in question:
 "[Prospective juror]: I also need to go back to your last question, too, about drugs. But I will start with this one.
 "I am self-employed. I can't afford to be here. I have asked to be excused and I couldn't see going that far.
 "But getting back to the drugs. I have a brother that does drugs. I am totally *Page 302 
against them and I always say if he didn't work, he'd steal. The only reason he doesn't steal is because he works.
"[Berryhill's counsel]: Yes, sir.
 "[Prospective juror]: And I don't know the young man and, not personal — then, it is — he looks guilty."
(R. 516-17.) (Emphasis added.)
Berryhill's counsel then allowed the other prospective jurors to answer whether they had any problem with serving on a jury for an extended period. Later, the trial court divided the venire into separate panels for further voir dire. Thereafter, Berryhill's counsel moved for a mistrial based on the prospective juror's statement that Berryhill "look[ed] guilty." The trial court stated that it would give the venire curative instructions regarding the comment. When asked whether it was denying the mistrial motion, the trial court stated that it would delay its ruling until it had polled the jury. As each venire panel was brought in for questioning, the trial court instructed the veniremembers to disregard the comment and asked "if there [were] any jurors that would not be able to follow [the] court's instruction and would hold [the prospective juror's] statement against the defendant." (R. 530.)
It is apparent from the record that Berryhill never renewed the motion for a mistrial after the trial court questioned each member of each venire panel. It appears that Berryhill was satisfied with the trial court's curative instructions and the responses of the other prospective jurors. Because Berryhill made no effort to renew the motion or to otherwise elicit a ruling on the matter, this issue is procedurally barred from our review.White v. State, 589 So.2d 765, 766 (Ala.Cr.App. 1991). This court will not review the merits of a motion presented by the appellant at trial unless the court below has issued a ruling adverse to the appellant on the motion. Knight v. State, 623 So.2d 376, 379
(Ala.Cr.App. 1993). It is the appellant's duty to preserve the record for appeal by invoking a ruling from the trial court.White, 589 So.2d at 766.
 IV.
Berryhill next contends that the trial court erred in denying his second motion for a mistrial when, later in the trial, Willcutt's daughter, after testifying and in full view of the jury, allegedly walked behind Berryhill, made a motion with her finger "like a gun," pointed her finger at Berryhill's head, and mouthed the word "pow." This event evidently took place on Saturday evening, and Berryhill's counsel was unable to bring it to the trial court's attention until the following Monday morning when court resumed. At that time, Berryhill's counsel moved for a mistrial. The trial court brought the jury in and asked the jurors whether they had seen Willcutt's daughter make the gesture. Seven jurors responded that they had seen the gesture. The jurors who did not respond were asked to leave the room, and the jurors who remained were instructed as follows:
 "THE COURT: First of all, ladies and gentlemen, the incident that took place was highly improper on the part of [Willcutt's daughter] and, at this time, I would like to instruct you to please disregard that and not hold it against the defendant.
 "And I would like to poll you individually to see if you would be able to disregard that from your deliberations and not hold that against the defendant."
(R. 2178.)
Each juror responded that he or she could disregard the incident and that he or she would not hold it against Berryhill. The trial court then instructed the jurors not to discuss the incident with the other jurors. The trial court again polled the jurors to determine whether they would be able to "completely remove [the incident] from the deliberations and not hold it against either side." (R. 2180-81.) Each juror responded affirmatively. At this point, Berryhill renewed his motion for a mistrial, which the trial court denied.
"A trial judge is allowed broad discretion in determining whether a mistrial should be declared, because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted." Dixon v. State, 476 So.2d 1236, 1240 *Page 303 
(Ala.Cr.App. 1985). "A mistrial is an extreme measure and should be denied when the prejudicial quality of the comment [or incident] can be eradicated by curative instructions." Walker v. State,631 So.2d 294, 300 (Ala.Cr.App. 1993).
The trial court issued the curative instructions to the affected jurors as soon as the incident was brought to the court's attention. The trial court polled the jurors who had seen the incident individually and determined that each could and would disregard the incident, thereby curing any prejudicial error that may have occurred. This prompt and thorough action by the trial court creates a prima facie presumption against error.Walker, 631 So.2d at 300. Berryhill's motion for a mistrial was properly denied.
 V.
Finally, Berryhill contends that there was insufficient evidence to sustain his convictions on two counts of capital murder. Specifically, he argues that there was no direct evidence that connected him to Willcutt's murder and that the evidence connected him only to a burglary of Willcutt's home.
 "`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State., 471 So.2d 485, 489 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985)."
Allen v. State, 611 So.2d 1188, 1192 (Ala.Cr.App. 1992).
Where a conviction is based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis but except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). "`Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.'" White v. State, 546 So.2d 1014,1017 (Ala.Cr.App. 1989), quoting Cochran v. State,500 So.2d 1161, 1177 (Ala.Cr.App. 1984), aff'd. in pertinent part,500 So.2d 1179 (Ala. 1985).
Applying these principles to the facts of this case, we find that there was sufficient evidence from which the jury could conclude that the evidence excluded every reasonable hypothesis except that of Berryhill's guilt. It was undisputed that Berryhill was in Willcutt's home on the day of the murder and that he stole certain items from the residence at that time. There was testimony that on the evening of the murder, Berryhill telephoned his friend Phillip Harless and asked Harless to "pick him up" at a service station near Willcutt's residence. Harless testified that when he arrived at the service station, Berryhill was acting "strange" or "nervous." (R. 1565.)
Laura Townsend, a friend of Berryhill's, testified that Berryhill told her that he had killed Willcutt. She stated that Berryhill told her that "he had gone inside [Willcutt's residence] and was looking around when [Willcutt] drove up." (R. 2112.) According to Townsend, Berryhill said that he "tried to escape or hide and he fell and [Willcutt] heard him inside. And he said that [Willcutt] walked inside and said, `I have a 9mm. I know someone's in here. There's going to be hell to pay.' He said that he stood up and said, `I have a gun, also. I don't want to hurt you. Just, you know, let me go.'" (R. 2112-13.) Townsend testified that Berryhill told her that Willcutt fired his gun at him, not actually trying to shoot him, and that Berryhill did the same, returning gunfire. She stated that Berryhill told her that Willcutt tried to "duck and hide," but was struck by one of the bullets. (R. 2114.)
Elizabeth Robbins, also a friend of Berryhill's, testified that Berryhill told her that he had shot Willcutt in essentially the same manner as testified to by Laura Townsend.
Berryhill testified in his own behalf and, by his own admission, stated that he entered Willcutt's residence with the intention of robbing him.
The evidence in this case, while circumstantial, supported a finding that Berryhill *Page 304 
shot and killed Willcutt during a burglary and a robbery attempt; the evidence was sufficient to sustain Berryhill's convictions on the two counts of capital murder.
For the reasons stated, the judgment of the trial court is affirmed.
OPINION OF APRIL 18, 1997, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; RULE 39(k) MOTION DENIED; AFFIRMED.
McMILLAN, COBB, BROWN, and BASCHAB, JJ., concur.
[1] We note that Berryhill's trial was held before January 1, 1996, the effective date of the Alabama Rules of Evidence. *Page 601