963 So.2d 679 (2006)
Gweneth Douglas POWERS and Anthony Powers
v.
STATE of Alabama.
CR-05-0489.
Court of Criminal Appeals of Alabama.
November 3, 2006.
Rehearing Denied December 15, 2006.
Certiorari Denied February 9, 2007.
*681 Collins Pettaway, Jr., Selma, for appellants.
Troy King, atty. gen., and Stephen N. Dodd, asst. atty. gen., for appellee
Alabama Supreme Court 1060501.
WISE, Judge.
Gweneth Douglas Powers and Anthony Powers were convicted of one count each of first-degree theft by deception, a violation of § 13A-8-3, Ala.Code 1975. They were sentenced to 25 years' imprisonment; Gweneth Powers's sentence was to run concurrently with another sentence previously imposed. The Powerses filed a motion for a new trial, which the trial court denied following a hearing. This appeal followed.
The evidence established that on April 30, 2003, Brenda Hawkins Vinson contracted with a lawn service owned and operated by the Powerses to install a sprinkler system in her yard; the agreed-upon price for the installation of the system was $2,000. Vinson testified that she gave the Powerses a check for $1,200 as a down payment because Anthony Powers told her he needed the money to purchase materials that evening so that he could begin the job the following morning. Vinson testified that she also contracted with Anthony Powers to mow her lawn. She stated that nobody came the day after she signed the contract, but that her yard was mowed two days later and that someone from Alabama One[1] came and marked the gas lines in her yard the following day. Vinson testified that it rained for several days after her lines were marked and that when she spoke with Anthony Powers and asked when the sprinkler system would be installed, he told her he was busy and was behind in his work. Vinson stated that she went out of town for a week and that when she returned no work had been performed on the sprinkler system. She testified that *682 she repeatedly telephoned the Powerses' office but was told that the Powerses were out of town. Vinson testified that she finally told them that she had paid them $1,200 before the work was started because Anthony Powers told her he was buying the materials needed for the sprinkler system, so she wanted him to bring the materials to her yard. According to Vinson, some materials were brought to her house the second week in May; Vinson characterized the materials, photographs of which were introduced into evidence, as "various odd, nasty, stripped PVC elbows," and "rusty wrenches and some bent flags . . . [a]nd, again, stripped out blue PVC elbows." (R. 67.) Vinson stated that when she spoke with Anthony Powers, he told her that the items were the materials that were to be used for her sprinkler system.
Vinson further stated that on Tuesday May 27, she spoke with the Powerses at her home and recorded the conversation. She told them that nearly one month had passed since they had executed the contract for the sprinkler system and that she was making what she characterized as a "last-ditch effort" to allow them to perform their end of the contract. The Powerses told her they would be digging the trenches for the sprinkler system within two days, that they would put the pipe in the day after the trenches were dug, and that they would be finished with the front yard by that Friday. Vinson stated that she was having a swimming pool installed in the backyard and that she was supposed to telephone the Powerses two weeks in advance of when that work was to be completed so they could come and install the sprinkler system in the backyard. According to Vinson, Anthony further stated that the pool work being done in the backyard would not affect their work on the sprinkler system in the front yard. Vinson testified that two days later, she came home from work and found some short trench work in her front flower beds, but that nobody came back to continue the work. She stated that she telephoned the Powerses' office on Monday June 2, to tell them that she wanted her money back. Vinson stated that Anthony refused to give her a refund and that she received a certified letter from the Powerses indicating that they had spent $600 on materials and offering her the remaining portion of her down payment as a $600 credit toward future yard work. Vinson conceded that the back of the contract she signed contained an arbitration clause; she stated that she was unaware of the language on the back of the contract when she signed the contract and that when she noticed it later that evening, she telephoned Anthony to express her concerns. Additionally, Vinson attempted to stop payment on her $1,200 check the following day, but was unsuccessful.
James Ramson testified that he worked for the Powerses during the time the sprinkler system was supposed to be installed at Vinson's residence. Ramson stated that Anthony told him to take some PVC pipe and elbows to Vinson's house. Ramson further stated that he and some other workers dug a few trenches and put out some flags at Vinson's residence before the Powerses sent him to another project. He testified that he did not have any training or experience in installing sprinkler systems.
The State also presented a number of witnesses to testify about similar encounters with the Powerses on other occasions. Jennifer Presley testified that she had hired the Powerses in June 2004 to install a sprinkler system and to perform other landscaping tasks at her home; these tasks included laying sod and putting down topsoil. She testified that she was told that work on the project would commence *683 the following week and be completed in two or three weeks. Presley stated that she made a $3,800 down payment toward the $5,700 contract price. Presley testified that the Powerses mowed the lawn a couple of times and, on July 21, 2004, moved a pile of bricks from her yard; she stated that she paid an additional $100 for the Powerses to remove the bricks. She stated that somebody would periodically come and rake some piles of debris but that there did not appear to be any work performed on the sprinkler project until August. Presley testified that in August, somebody placed flags in the ground where the sprinkler heads were supposed to be located; she further testified that some work was performed on a separate drainage problem along the side of her house. Presley testified that her husband spoke with the Powerses in August and that he was told the sprinkler project would be completed in a couple of weeks. On August 18, someone came and laid some sod in her yard; that person told Presley he had approximately 30 yards of topsoil, an amount that was insufficient to cover the yard. Presley stated that she told the driver that her original quote from Gweneth had been 60 yards of soil, and the driver acknowledged that that amount would be sufficient. She stated that she spoke with the Powerses on August 18 because they had moved some hay bales from the property line that had been temporarily blocking rainwater from draining into the neighbor's pool; Presley testified that Anthony told her they would begin digging trenches for the sprinkler system the following day. According to Presley, some workmen came on August 19, but, instead of digging trenches for the sprinkler system, they began spreading the topsoil. Presley testified that nobody from the Powerses' lawn service came back after August 19. She stated that she spoke with an attorney about terminating the contract; the attorney advised her to allow him to send a letter terminating the contract, and she waited approximately one additional week before eventually hiring somebody else to install a sprinkler system at her residence. Presley testified that around September 7-10 Anthony telephoned her "checking on things" (R. 174) at which time she told him that she had hired somebody else to do the work; she stated that Anthony denied receiving a letter from her attorney terminating the contract. Presley testified that she received a letter from the Powerses claiming that $3,753.49 of the initial $3,800 down payment had been spent for the work performed, and that she was being given a credit of $46.51 toward her account with the lawn service.
Nancy Parrish testified that she was employed by the Powerses for approximately one and a half months in 2003. According to Parrish, one of her responsibilities was to provide estimates to customers for requested jobs. She stated that she was not trained in landscaping. Parrish testified that the Powerses told her that in the event that a prospective customer declined to hire them to do the work she was giving an estimate for she was to drop the estimate price as much as was necessary to get the job, and that she was always to get a signed contract and one-half of the contract price up front as a down payment. Parrish stated that initially she was unaware that there was an arbitration clause on the reverse side of the contract; she testified that she asked Gweneth about it only after speaking with Vinson on the telephone, and that Gweneth told her that they would handle Vinson and for her not to worry about the information on the back of the contract because customers never looked at that section of the contract.
*684 Parrish further testified that she got quotes from subcontractors to perform curbing work at Cherokee Middle School, a landscaping project the Powerses had undertaken. She stated that she told the Powerses that Ralph Shaw of Creative Curbing was the lowest bidder, and the Powerses told her to use him to perform the curbing work. Parrish further testified that as she left their office after they told her to hire Shaw she overheard the Powerses laughing; she stated that she thought they might be talking about her so she eavesdropped and heard Anthony say "`It's not like we're going to pay that anyway' or `pay him anyway.'" (R. 237.) Parrish testified that Shaw completed the work, but he had not been paid by the time she stopped working for the Powerses in May. She stated that on her last day of employment with the Powerses, Shaw came to the office and beat on the door, demanding to be paid. Parrish testified that she telephoned Anthony and put him on the telephone with Shaw; she stated that she heard Shaw and Anthony yelling at each other over the telephone and that Shaw threw the telephone at her, so she locked the door, telephoned the police, and left the office through the back door. Parrish further testified that she was paid for only three days of the month and a half that she was employed by the Powerses.
Ben Jared testified that he hired the Powerses to install a sprinkler system at his residence in October 2001; he stated that he signed a contract for $4,000 and that he made a $2,000 down payment. According to Jared, he initially did not hire the Powerses because he wanted to finish some other work being performed on his house before having the sprinkler system installed, but that they telephoned him and told him they could install the sprinkler system the following week if he would go ahead and sign the contract. Jared stated that they agreed that work would begin around the first of December. Jared testified that after he signed the contract, Gweneth told him they had run into problems and did not know when they would be able to start work on the sprinkler system. Jared stated that after he had made numerous telephone calls asking for a refund of his down payment, somebody began work on December 29; he stated that somebody dug some trenches and put some pipes in, but told him that after December 29, it would be January 2 before any more work would be performed because of the New Year holiday. Jared testified that the contract called for a specific caliber of pump but that the pump that was brought to the site was a lower-power pump. According to Jared, even though the original contract called for the initial down payment and then no further payments until the work was completed, the Powerses told him they would not do any more work until they had been paid more of the money owed on the contract; Jared stated that he paid them an additional $1,000 on January 12 after they assured him that certain progress would be achieved by January 15. According to Jared, no additional work had been performed by January 15, so he engaged in some heated conversations with the Powerses. He testified that he told Anthony that he was going to stop payment on the $1,000 check if they did not work on the project on January 16. According to Jared, when he arrived at his residence at the end of the day on January 16, all of the equipment that could be removed was gone, and the remainder "all the sprinkler heads, the control valves  they had been sawed off with a hacksaw and taken with them." (R. 325.) He stated that he telephoned Anthony and that Anthony told him the equipment had been removed because it would not work on the size of pump that was to be used; Jared said he *685 learned that that was not true, so he stopped payment on the $1,000 check. He testified that he attempted to settle the dispute by arbitration but that Anthony told him that arbitration was useless because he would not comply with the arbitrator's ruling if he did not agree with the ruling. Jared further testified that he attempted to use the arbitration service of the Better Business Bureau, to which he claimed the Powerses initially agreed but then changed their minds because of some issue they had with that agency. He eventually forwarded the Powerses a list of every approved arbitrator in a 100-mile radius of Florence and told them to pick one of their choosing; they never responded. Jared testified that he was getting desperate so he again reached an agreement with the Powerses for them to continue with the work and he would give a third party an additional $4,390 to hold until the work was completed. Jared stated that the Powerses did not do any additional work on the project by February 13, which was the newly agreed-upon progress date, at which time he terminated their services and hired another company to install the sprinkler system.
Tipper Borden testified that around August 2003 Gweneth telephoned him and asked him to haul some topsoil for a project the Powerses were working on; Borden testified that they agreed that a portion of the work would contain topsoil and a portion would contain dirt. He stated that he hauled 20 truckloads of topsoil and dirt to the site, spread it, and dug trenches and placed pipes in the trenches. He testified that they had orally agreed upon prices for the dirt, but had not discussed the additional work; he stated Gweneth requested that he do the additional work because the Powerses were busy. Borden stated that he provided the Powerses with his invoices for doing the work. According to Borden, Anthony disputed the use of topsoil because topsoil was more expensive than dirt; Borden stated that he agreed to charge the dirt price for the entire amount, lowering the approximately $3,500 bill for the soil and labor to approximately $3,300. Borden testified that he was never paid for the work he performed, despite repeated telephone calls demanding the money.
Craig Thompson testified that he was one of the owners of Thompson and Fisher General Contractors. According to Thompson, his company was hired to perform work at the site of Shoals Behavioral Medicine in April 2004. He stated that he was at the site when he was approached by the Powerses asking if he had hired anyone to do the landscaping. Thompson stated that he had not, and he allowed the Powerses to submit a quote based on the landscaping plan that had been drawn for the project. According to Thompson, the Powerses quoted him a price of $13,789, and they eventually agreed to perform the work for $13,000. Thompson stated that he paid the Powerses $6,500 as a down payment. He stated that the August 10, 2004, contract provided that the Powerses would begin work on August 20, 2004, and complete their work on September 7, 2004. He stated that on September 7, 2004, some grading work had been done on the site, but that only about 10 percent of the agreed-upon work had been performed. According to Thompson, he repeatedly told the Powerses that they needed to finish their work by the deadline. Thompson testified that the Powerses told him one time that their tractor was broken and another time that they were working on another job, and several times they just did not return his telephone calls. Thompson stated that he terminated their contract because they failed to do the job.
Tori Bailey testified that she was the owner and general manager of WZZA radio *686 station in Florence. According to Bailey, Powers Lawn Service purchased advertising from her station in April 2002. Bailey testified that they entered into a one-year contract, which was to be paid in monthly installments. She stated that the Powerses paid the monthly installment in April and again in May but did not pay anything in June, July, or August. According to Bailey, the Powerses told her they were having difficulty with their bank but that the problem would be resolved soon. Bailey testified that she received a check in September, but that that check was returned by the bank; she stated that her bank advised her that the Powerses' bank had refused to honor the check, so she went to that bank and was told that the check could not be honored. Bailey stated that she informed the Powerses in October that she was discontinuing the advertising because she had not been paid since May.
The defense presented a number of witnesses. Hillard Matthew Smith testified that he was employed with Powers Lawn Service during the spring of 2003. Smith testified that he and another employee did work on installing the sprinkler system at Vinson's house; he stated that they dug trenches in the flower beds at Vinson's home with shovels rather than a trencher machine because the shrubbery prevented the use of the machine.
Lynn Murphy testified that she worked for Tallman Company selling PVC pipe and other plumbing supplies. She identified two invoices from Tallman Company indicating that Powers Lawn Service had purchased PVC pipe on July 22, 2002, and on August 20, 2003.
Capt. Jim Heffernan with the Tuscumbia Police Department testified that he was the investigating officer in the complaint filed by Vinson. He testified that he had used the term "civil matter" when investigating the case, but that he had taken the case to the district attorney for presentation to the grand jury. He testified that he had viewed the tub of parts brought to Vinson's house for use in the sprinkler system and stated that in his opinion they appeared to be "used" parts.
Gweneth testified that she was an employee of Powers Lawn Service, which she characterized as a sole proprietorship owned by Anthony. She stated that they had performed assorted lawn functions for Vinson before the sprinkler-system job, and that Vinson had read the front and back of the contract before signing it. She stated that they spoke with Vinson on Friday, May 2, and that Vinson told them that all of the underground utility lines had not yet been marked. According to Gweneth, they could not begin digging until all of the lines had been marked. Gweneth testified that it rained a number of days the following week preventing them from working on the sprinkler system. She further testified that their company did not work weekends. Gweneth also stated that they had taken on another job prior to Vinson's signing the contract, thus requiring them to work on that job first. She stated that they finished the other job and that she and Anthony went to Vinson's on May 27 and placed flags in the ground where the sprinkler heads were to be located. Gweneth testified that they brought a tub of spare parts to the site to keep for reference or to use for parts. She further stated that Vinson seemed to be pleased with the progress to that point. According to Gweneth, Vinson approached her and Anthony and told them to finish the front and side yards and that she would telephone them after the pool had been installed in the backyard so they could come back and install the sprinkler system in the backyard. Gweneth testified that they told her that they would *687 install the clock and cover the trenches after the system had been completely installed and had been tested  she stated that they did that so that in the event of a leak, they could easily locate the problem rather than having to dig up the system completely.
According to Gweneth, Vinson became angry when they told her they would not finish installing and covering the front and side yards until completing the backyard; Gweneth stated that Vinson told them to leave. Gweneth testified that they complied and that they did not hear from Vinson for approximately one week. Gweneth stated that Vinson telephoned them on June 2 and told them she was going to call the police if they did not give her her money back; Gweneth stated that Anthony told Vinson that they their policy did not allow for refunds. According to Gweneth, Vinson called them back later that evening and told them she had spoken with the district attorney and that she was going to call the police if they did not give her a refund.
Gweneth testified that they sent Vinson a certified letter on June 3 explaining that she had breached her contract; she stated that the letter further informed Vinson that the company had incurred costs on the sprinkler-system project, including labor and parts, and offered her a credit toward future services for the amount of her down payment in excess of those costs.
Gweneth further testified about the work that had been performed on Jared's sprinkler system and claimed that the work was progressing smoothly until Jared stopped payment on his check, at which time, she said, they removed their parts and equipment from the site. She further explained the delays on the Thompson project as the result of Thompson's interference, equipment problems, and weather delays. She stated that they began working on the Presley project and encountered weather delays; according to Gweneth, they telephoned Presley to check the ground conditions and learned that she had gotten somebody else to finish the sprinkler installation. Gweneth testified that she was not a party to the advertising contract between the lawn-service business and Bailey's radio station even though she had paid for the first two monthly installments with a check drawn from her personal account. With regard to the Borden incident, Gweneth testified that they asked Borden to supply "field dirt" rather than topsoil for the entire project. She conceded on cross-examination that she had previously pleaded guilty to second-degree theft in Colbert County in 1998.
After both sides had rested and the trial court had instructed the jury on the applicable law, the jury returned a verdict finding the Powerses guilty of first-degree theft by deception as charged in the indictment.

I.
The Powerses first contend that the trial court erred when it allowed the State to introduce evidence of collateral acts of misconduct in violation of Rule 404(b), Ala. R.Evid. The State argues that this issue was not preserved for appellate review.

A.
Before trial, the State notified the Powerses of its intent to offer Rule 404(b) evidence; the State averred that it intended to elicit testimony from (1) Jennifer Presley regarding the Powerses' alleged failure to install a sprinkler system in her yard after she paid a substantial down payment; (2) Ralph Shaw regarding the Powerses' alleged failure to pay him for some curbing work done on behalf of the Powerses' lawn business; (3) Craig Thompson regarding the Powerses' alleged *688 failure to perform landscaping work after he had paid them $6,500 in advance; (4) Ben Jared regarding the Powerses' alleged failure to finish installing a sprinkler system after he had paid $2,000 toward the project; (5) Tipper Borden regarding the Powerses' alleged failure to pay for Borden had supplied the Powerses for a landscaping project; and (6) Tori Bailey with WZZA radio station regarding the Powerses' alleged failure to pay for radio advertising. The Powerses filed a motion in limine seeking to prohibit the State from introducing evidence of their prior convictions.[2] The Powerses filed a motion in opposition to the State's notice that it intended to present Rule 404(b) evidence. The State informed the trial court at a pretrial hearing that it did not intend to elicit evidence of Gweneth's "former convictions out of Lauderdale County." (R. 12-13.) The State indicated that the Powerses did have other prior convictions, and that it would introduce those convictions into evidence should those prior convictions become relevant. The record is silent as to any ruling by the trial court on the motion in limine or the motion in opposition of the Rule 404(b) evidence.
At trial, Presley testified without objection about her dealings with the Powerses. However, during Nancy Parrish's testimony, the Powerses objected when the prosecutor began questioning Parrish about estimates she had performed for subcontractors on a curbing job at Cherokee Middle School. The trial court excused the jury and conducted a hearing off the record; once back on the record but still outside the presence of the jury, the following exchange occurred:
"[Prosecutor]: Well, Judge, another thing, a matter that I asked this witness about is the fact that 
"THE COURT: Let the record reflect we are outside the presence of the jury.
"[Prosecutor]: fact that she was not paid for her time there as their secretary. And I have mentioned that to Mr. Powers. He made the suggestion that bankruptcy had been filed as it regards her judgment. She did give a judgment against him. I have instructed her not to go into any details about that she filed civil suit to get her pay. So he's suggested that the bankruptcy, you know, the automatic stay that's in place.
"But, your Honor, the automatic stay only prevents her from making any effort to collect that debt. She is stayed from collecting this judgment. It doesn't prevent her from coming to court under subpoena and testifying that she worked for them and they didn't pay her.
"MR. POWERS: Well, now, Judge, if he get into that, we going to ask her questions about how she tried to overcharge us. I mean, we going to put that before the jury as well.
"[Prosecutor]: Oh, that's fine.
"THE COURT: You are entitled to do that.
"MR. POWERS: Okay. Thank you."
(R. 232-33.) Parrish then completed her testimony without further incident.
After Tipper Borden testified about work he had performed for the Powerses, the State offered copies of Borden's invoices. Anthony objected on the grounds that the invoices were irrelevant; the trial court admitted the exhibits after the State argued that the evidence was to show "the *689 pattern of deception that the Powers[es] engaged in throughout the business practice." (R. 374.)
As Gweneth prepared to take the stand, the trial court cautioned her that she would be subject to cross-examination. The prosecutor stated that he intended to question her about, among other subjects, her prior convictions. Gweneth referred to the motion in limine, at which time the prosecutor acknowledged that he had confirmed that Gweneth's convictions in Lauderdale County had been set aside, so he did not intend to question her with regard to those matters. The prosecutor further indicated that he did not intend to introduce evidence of pending cases or of Gweneth's conviction in Franklin County. The prosecutor did, however, advise the court that he intended to question Gweneth about her conviction in Colbert County, and Anthony about his conviction in Colbert County if he also took the stand. The trial court informed the Powerses that the State could question them as to those convictions.
"In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court." Goodson v. State, 540 So.2d 789, 791 (Ala.Crim.App. 1988), abrogation on other grounds recognized by Craig v. State, 719 So.2d 274 (Ala.Crim.App.1998). "When a timely objection at the time of the admission of the evidence is not made, the issue is not preserved for this Court's review." Ziglar v. State, 629 So.2d 43, 47 (Ala.Crim.App. 1993).
"This court will not review the merits of a motion presented by the appellant at trial unless the court below has issued a ruling adverse to the appellant on the motion. Knight v. State, 623 So.2d 376, 379 (Ala.Cr.App.1993). It is the appellant's duty to preserve the record for appeal by invoking a ruling from the trial court. White [v. State], 589 So.2d [765] at 766 [(Ala.Crim.App.1991)]."
Berryhill v. State, 726 So.2d 297, 302 (Ala. Crim.App.1998).
After reviewing the transcript, the motion in limine regarding the Powerses' prior convictions, Powerses' response to the State's notice of its intent to introduce Rule 404(b) evidence, and the Powerses' brief and reply brief, it is clear that the specific issue argued on appeal was not preserved for appellate review by a timely objection and an adverse ruling. The Powerses' argument on appeal challenges the admission of Rule 404(b) evidence involving collateral acts between the Powerses and other individuals who had unsatisfactory dealings with the Powerses' lawn business. The trial court granted the Powerses' motion in limine as to prior convictions, but that motion did not encompass collateral acts of misconduct the State had referenced in its Rule 404(b) notice. The trial court never ruled on the Powerses' response to the State's Rule 404(b) notice.
Further, although the Powerses did object when Tori Bailey was asked about her dealings with the Powerses, Gweneth did not state for the record any grounds and instead asked to approach the bench; the trial court heard the objection off the record, and the trial resumed. (R. 423-24.)
"If counsel makes objections and secures rulings `off the record,' this court cannot consider those rulings. If the trial court hears objections and makes rulings in side-bar conferences only, then the court reporter must be a party to the side-bar conference if the actions *690 of counsel and the court are to be recorded. Our review is limited to matters of record."
Jefferson v. State, 449 So.2d 1280, 1282 (Ala.Crim.App.1984).
Finally, the Powerses did not object when the State elicited testimony from various witnesses regarding the collateral acts. The only time the Powerses objected on the record about collateral-act testimony came during Borden's testimony; the trial court correctly denied that objection and allowed the evidence to be admitted into evidence. However, as noted in Part III of this opinion, "[e]vidence of other similar failures to perform may be considered to establish that the defendant never intended to perform the promise made, and the defendant's fraudulent intent can be inferred from the defendant's conduct and the circumstances of the case." Baker v. State, 588 So.2d 945, 947 (Ala.Crim.App.1991), citing Benefield v. State, 469 So.2d 699, 701 (Ala.Crim.App. 1985). The complained-of evidence was clearly admissible, and was not so unduly prejudicial as to outweigh the probative value of the evidence. Thus, even if this issue had been preserved, the Powerses would not have been entitled to any relief because the claim is without merit.

B.
The Powerses further contend that the trial court erred in not giving the jury a limiting instruction as to the purposes for which the testimony was offered and for which it could be considered. However, the Powerses did not request any such limiting instruction, nor did they object to the trial court's failure to sua sponte offer such an instruction. Thus, this argument is not properly before this Court. See Pardue v. State, 571 So.2d 320 (Ala.Crim. App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990).
For these reasons, the appellants are not entitled to any relief on this claim.

II.
The Powerses next argue that the trial court erred in refusing to give their requested jury instructions number two and number four.
The Powerses argued for the first time in their post-trial motions for a new trial that the trial court erred in refusing the requested jury instructions. However, Rule 21.3, Ala.R.Crim.P. states:
"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."
(Emphasis added.)
Here, the only objection contained in the record that was raised by the Powerses before the jury began deliberations involved Gweneth's request that the trial court replace one of the jurors with the alternate based on Gweneth's contention that that juror had been sleeping during part of the trial. Thus, because the Powerses did not object to the trial court's refusal to give the instructions before the jury began its deliberations, the Powerses did not preserve this argument for our review. See Douglas v. State, 900 So.2d 1271, 1273 (Ala.Crim.App.2004); Bullock v. State, 697 So.2d 66 (Ala.Crim.App.1997).[3]
*691 In any event, the Powerses were not entitled to have the requested instructions read to the jury. "The trial court is vested with broad discretion in formulating its charge, so long as it accurately reflects the law." Clark v. State, 621 So.2d 309, 324 (Ala.Crim.App.1992). "A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case." Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App.1986). A trial judge does not err in refusing requested charges, when its oral charge substantially covers the requested charges. See Adams v. State, 659 So.2d 224, 228 (Ala.Crim.App. 1994) (citing Rule 21.2, Ala.R.Crim.P.). With regard to the Powerses' requested instruction number 4, i.e., that the Alabama Legislature intended to adopt the rationale of the Model Penal Code defining theft, the trial court's oral instructions clearly, concisely, and accurately defined theft; thus, there was no need to give the Powerses' requested jury instruction on this point of law. Conversely, with regard to the Powerses' requested instruction number 2, i.e., that the victim's consent can warrant acquittal pursuant to Kellett v. State, 577 So.2d 915 (Ala.Crim.App.1990), we note simply that the facts in Kellett involved whether the appellant had modified an insurance policy to provide for an additional commission with or without the consent of the persons responsible for negotiating such changes in the city's insurance policy. Here, it is uncontested that Vinson gave a check to the Powerses. Thus, her consent is not at issue in that respect. However, for the principles discussed in Kellett to be applicable to this case, there would have had to have been a question of whether Vinson consented to the Powerses obtaining and retaining her property without intending to complete the agreed-upon landscaping work. There was no such evidence; therefore, the Powerses' requested jury instruction on this point of law was properly refused.

III.
Finally, the Powerses contend that the State failed to present any evidence indicating that their actions constituted a criminal act. Specifically, they argue that the incident involved a business deal that went awry and that the matter should have been resolved via civil remedies because, they claim, there was no evidence indicating that they acted with criminal intent.[4]
Section 13A-8-2, Ala.Code 1975, which defines theft of property generally, states:
"A person commits the crime of theft of property if he or she:
"(1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his or her property.
"(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his or her property. . . . "
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all *692 evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala. Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala. Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
Further, "`[i]ntent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'" Ex parte C.G., 841 So.2d 292, 301 (Ala.2002), quoting Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157 (1908). Although evidence tending to show intent is usually circumstantial, "[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt." Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992). Finally:
"Section 13A-8-1(1)(f), Code of Alabama 1975, states that deception occurs when a defendant knowingly `[p]romises performance which the defendant does not intend to perform or knows will not be performed. Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform.'
"Failure to perform a promise, together with evidence that the promise was made with the intention not to perform rather than merely broken, may support an inference of deceptive intent in a prosecution for theft of property by deception. Benefield v. State, 469 So.2d 699 (Ala.Crim.App.1985). Evidence of other similar failures to perform may be considered to establish that the defendant never intended to perform the promise made, and the defendant's fraudulent intent can be inferred from the defendant's conduct and the circumstances of the case. Benefield, supra, 469 So.2d at 701."
Baker v. State, 588 So.2d 945, 947 (Ala. Crim.App.1991).
Viewing the evidence in the light most favorable to the State, we conclude that the State presented sufficient evidence from which the jury could have reasonably concluded that the Powerses exerted control over $1,200 from Vinson's account after she had hired the Powerses to install a sprinkler system, that the Powerses failed to complete the agreed-upon work, and that, especially in light of the evidence indicating that the Powerses had other similar failures to perform, the Powerses never intended to perform the agreed-upon work. These actions clearly fall within the definition of theft of property as *693 defined by §§ 13A-8-2 and 13A-8-3, Ala. Code 1975. No basis for relief exists as to this claim.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB and SHAW, JJ., concur.
BASCHAB, J., dissents, with opinion.
BASCHAB, Judge, dissenting.
I must respectfully dissent. The record in this case does not affirmatively indicate that the trial court advised the appellants about the dangers and disadvantages of self-representation, as required by Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and does not affirmatively indicate that the trial court advised them that they had the right to withdraw any waiver of the right to counsel at any time during the proceedings, as required by Rule 6.1(b), Ala. R.Crim. P. Therefore, we should reverse the trial court's judgment and remand this case for a new trial. See Farid v. State, 720 So.2d 998 (Ala.Crim.App.1998); Hairgrove v. State, 680 So.2d 946 (Ala.Crim.App.1995).
NOTES
[1] The testimony indicated that Alabama One was an entity that came before work involving digging and marked all applicable utility lines buried in the area.
[2] Although not contained in the record, the State apparently provided the Powerses during discovery information about the Powerses' prior criminal charges and felony convictions.
[3] The record indicates that the trial court conducted a charge conference. However, a transcript of that conference is not contained in the appellate record, nor does the record indicate that the Powerses objected at that charge conference to the trial court's refusal to give the requested jury instructions.
[4] It is apparent from reading the transcript and the Powerses' brief that much of their argument is based on the misguided belief that the arbitration clause inserted on the back of their landscaping contract that was signed by Vinson superseded the State's ability to prosecute individuals for criminal conduct. Suffice it to say the State was not a party to the landscaping contract, and the language contained therein indicating that "all disputes" be handled through arbitration has no bearing on the State's ability to prosecute the Powerses criminally for their actions.