THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARDICE HEFLIN, Defendant-Appellant.

Second District (1st Division)    No. 75-172

Opinion filed July 20, 1976.

Ralph Ruebner and J. Daniel Stewart, both of State Appellate Defender's Office, of Elgin, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan (Phyllis J. Perko and Christine M. Drucker, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Defendant was convicted of murder and conspiracy to commit murder after a jury trial. The court entered judgment only on the murder conviction and sentenced defendant to a term of 30 to 60 years' imprisonment. On appeal defendant contends that he was not proven guilty of the offenses beyond a reasonable doubt; that the court erred in denying his motions to suppress evidence; and that various other rulings deprived him of a fair trial. Alternatively, he contends that the sentence is excessive.

The charges resulted from the death of Clifford Atkinson on January 3, 1974. Atkinson's widow, Karolyn, was also indicted on the same charges. She was tried separately and was found not guilty in a jury trial held after defendant's trial.

Several officers testified that they had responded to a reported burglary in progress at the Atkinson home shortly after midnight on January 4, 1974. Karolyn Atkinson told the first officer to arrive that her husband was downstairs holding a burglar. Before he could go down, she stated that her husband was dead. She gave various further explanations to the officers. Finally, she said that she and her husband had heard voices in the basement and he went downstairs. She heard loud noises. Then it was quiet, and she saw a dark figure leave the house. Later she added that her husband took a rifle downstairs with him. Still later she said that the man she saw was a tall Negro wearing dark clothes and yellowish-orange gloves and that the man told her that her husband was only unconscious. She said the man had demanded money, that she told him where her husband's wallet was, that he took the money from it and left.

The officers also testified that Clifford Atkinson's body was at the foot of the basement stairs. There were large, deep cuts on the hands of the deceased and scratch marks under his chin. It was noted that in addition to the stairway to the basement from the house, there was a basement exit which led directly outside. There were no footprints in the fresh snow outside the exit, making it unlikely that it had been used by anyone that evening.

Detective James Sroka testified that he arrested defendant in Waukegan shortly after noon on January 4. Defendant was advised of his constitutional rights at the station and said he understood them. When

defendant was asked to empty his pockets on the desk, defendant stated, "here's the key; you can find the knife at the train station." Defendant went to the train station with Officers Sroka and Pasquini where he opened a locker and took out a black attache case with the name "Chris Heflin" imprinted on it. Defendant told Officer Sroka that the knife and the clip from a .22-caliber rifle were in the case. When the case was opened, these items were found, as were rubber gloves and items mainly related to defendant's occupation as a vacuum cleaner salesman. Defendant had only $15 cash at the time of his arrest.

Officer Pasquini testified that when they returned to the station, defendant was again advised of his rights, responded that he understood them, and signed a waiver form after reading it. According to the witness, defendant admitted coming to the Atkinson home at 2 or 3 o'clock on January 3 and remaining there until after the shooting. After Mr. Atkinson came home from work, Heflin remained in the basement. Later, he decided to leave the house but bumped into something, making a noise. Atkinson came to the top of the stairs with a rifle and saw the defendant. The two men started struggling for the gun; defendant remembered he had a knife, which Karolyn had given him earlier in the day; he pulled the knife and Atkinson tried to take it from him.

Karolyn Atkinson joined the struggle. Her husband directed her to obtain control of the gun and to shoot Heflin. Heflin heard a shot and heard Atkinson say, "You shot me. Shoot him." The defendant heard a second shot; Atkinson tried to roll over on his side, but then fell on his back. Heflin heard what he knew was a death groan.

The officer testified that he had asked defendant if he was in love with Karolyn Atkinson and defendant replied that he was. Defendant stated that he and Karolyn had met at a tavern in Waukegan two or three months before, that they had both talked about her divorce but had not made plans one way or the other. Heflin said Karolyn had told him that there was a $30,000 life insurance policy on Clifford but then said that he had made a mistake, that it was house insurance.

At approximately 10:15 a.m. on January 5, Officers Pasquini and Sroka again talked with defendant after re-advising him of his rights. Pasquini told defendant that he did not believe the story about Clifford standing on the stairs with a rifle and asked what really happened. Defendant said he did not want to tell—he wanted to protect Karolyn. In response to the officers' questions defendant said that Clifford was building a new house, that he and Karolyn had agreed that they should wait until the house was built, that then she would divorce Clifford and marry defendant, and that they would live in the new house. Defendant stated that Clifford Atkinson did not have the rifle when he was on the stairs.

Officer Pasquini also testified that later that same morning he and

Officer Sroka and another officer had further conversation with defendant in which defendant admitted that when he first saw him the deceased had no weapon in his hands.

Dr. Zech, a pathologist, testified that he performed an autopsy on Clifford Atkinson's body at 10 a.m. on the morning of January 4, 1974. In his opinion Atkinson's death was caused by a bullet which penetrated and passed through the lower right lung, the aorta, the posterior wall of the heart and the left lung, causing massive hemorrhaging into the thorax cavities to the extent of about 85% of the body's blood. A second bullet wound was found on the left thigh, just above the knee cap. There were abrasions on both the deceased's hands and his left forearm and deep cuts involving the second and third (or index and middle) fingers of the left hand. Because of the effect of the fatal bullet wound on the circulatory system, the doctor could not be certain whether the cuts and abrasions had been inflicted before or after death.

The State also adduced testimony that a .22-caliber cartridge casing was found near the body. The State called Highland Park Police Sergeant Donald Verbeck as a fingerprint expert. He told of lifting fingerprint impressions from the rifle. There was a stipulation that the fingerprints which the witness had described were the fingerprints of the defendant. On cross-examination the witness testified that there were other impressions that were visible but that these were the only impressions suitable for making a comparison.

The State also introduced a series of letters written by Karolyn Atkinson to the defendant. In a letter written the last week of November, Karolyn wrote that she hoped to visit the defendant that weekend and wanted to see his mother before she went back in the hospital in the following week. In a letter written after Thanksgiving (People's Exhibit No. 22) she wrote that she had been surprised by defendant's expressed intention of trying to get custody of his son from his former wife and wondered how his son would "like having three sisters all of a sudden," an apparent reference to her own children. In a letter dated November 19, 1973, and postmarked November 26, 1973, Karolyn wrote that she enjoyed their weekend and their "2nd Anniversary dinner Sun. afternoon," that she hoped some day to be able to celebrate years instead of months, that she was looking at the 1974 calendar to see when the 21st falls on a Saturday, and that the first time was September 21 which she stated was "a long way from January, but it is a very good date. I don't know exactly how long I'm expected to stay in morning. [sic.] I'd hate to wait all the way to September." In a letter postmarked November 26, 1973, Karolyn expressed her desire to be with the defendant on a permanent basis and stated, "Lets hurry our plans." In a series of undated letters Karolyn wrote about the progress being made in building the new Atkinson home and noted that the later

the carpenters started, the longer "you are holding off on our plans." She also wrote "There's only 8 more days left, I can hardly wait. Then we have a wait of 49 days until we can be secretely [*sic*] married in Mich. * * * ." And "only 5 days to go and then only 49 from then but 57 from today."

The State also introduced letters written by defendant to Karolyn. In one letter, dated October 5, 1973, defendant expressed his love for Karolyn. On November 25, 1973, defendant wrote of his great love for Karolyn. In an undated letter, defendant wrote that he was upset when he woke up and did not find Karolyn at his side, that he wanted Karolyn for himself, that no one else was to share her love and, "life is so great without your husband that I think that I will retiree [*sic*] him permanently."

The State called Jon Heflin, the defendant's older brother, who testified that during the first week of December 1973, defendant told him that Mrs. Atkinson's husband had died while working on high power lines.

The Circuit Clerk of Lake County testified that she had examined the divorce records from September 1973 to date and found no record of any divorce filed by Karolyn Atkinson.

The State also called an insurance sales agent who testified that he had sold a $30,000 decreasing term policy insuring Clifford's life in connection with the mortgage on the new house the Atkinsons were building. Karolyn Atkinson was named the beneficiary of the policy which was dated November 1, 1973.

The defense introduced correspondence between the parties. In an undated letter defendant wrote about his financial troubles, in taking care of himself and paying child support for his son. He stated, "So I don't mean to sound greedy when I speak of how you would get the house and child support. I am just worried about taking on the responsibility of four girls." In an undated letter (Defendant's Exhibit No. 22) defendant expressed fear that Karolyn was still in love with her husband and that if a showdown came, he would lose her and said that, therefore he was leaving the country. In a letter dated October 30, 1973, defendant wrote that his mother had gotten out of the hospital, and said, "She doesn't look good at all. Her moral [*sic*] is real good though. She knows that she is dying, but she won't let on that she knows."

In an undated letter written by Karolyn to defendant, Karolyn stated, "I hope this divorce comes through fast." In a letter postmarked December 26, 1973, Karolyn wrote defendant, looking forward to "Our Christmas" and New Year's in January, that she liked defendant's mother and could hardly wait to see her again and that she wanted to be with defendant when he told her about "our date" but if not, she wanted to know exactly what defendant's mother said. In Defendant's Exhibit No. 40 Karolyn referred to seeing defendant on the 3rd.

The defense called Officer Philip Stevenson of the Waukegan police department, who had interrogated Mrs. Atkinson immediately following the shooting. He testified that at 2:27 a.m. on the morning of January 4 she told him the story about a burglar, but that at some time following 4:50 a.m. on the morning of January 4 she admitted she had shot her husband. At 6:20 a.m. on that day, she stated that defendant was also involved, that she had seen defendant numerous times, and that he had been over to her house dozens of times. She gave the officer the following account of the events surrounding the shooting: she had picked up defendant at the airport on January 3, 1974, in the morning and had taken him to her house. At 4:15 she went to pick up her husband, leaving defendant in the house; they arrived back home at approximately 9 o'clock after driving out to where their new home was being built. Her husband went out to feed the dog and upon reentering the house heard a loud noise in the basement and went down there without a weapon. She heard noises which she thought was a struggle, went into the bedroom, got her husband's rifle, and ran down the basement stairs where she saw her husband fighting with another person. Her husband yelled at her to shoot the other person. She fired a shot which hit her husband who yelled that she had shot him. Then she noticed that the man her husband was fighting with was defendant, who had begun calling her name. She thought that since he was calling her name, her husband would know who he was, so she shot her husband again and he fell motionless to the floor. For a moment she thought her husband might still live and would know who defendant was; she contemplated shooting defendant and pointed the gun at him but did not shoot. Then she and defendant went upstairs and formulated the story about the black burglar following which defendant left the house. Then Karolyn put her husband's wallet in her coat pocket, took apart the gun, wrapped it in a towel and placed it in the closet. A .22-caliber rifle wrapped in a towel was found in the closet at the Atkinson home.

The defense called Karolyn Atkinson as a witness but she refused to testify, claiming possible self-incrimination.

The defense also called Jon Heflin, defendant's brother, who testified that their mother had been diagnosed as having terminal cancer in September or October of 1973 and had a life expectancy of 2 or 3 months at that time. The witness stated that his conversations with Karolyn indicated that she was aware of defendant's mother's condition. He also testified that his mother was alive.

Defendant testified that he changed his name to Christopher Scott Heflin 4 years previously. He was not presently married but had previously been married three times; each marriage ended in divorce—the last in the summer of 1970. He met Karolyn on September 21, 1973, and had sexual relations with her that night. He was working in North

Chicago and saw her almost daily from September 21 until the end of October 1973, when he went to Michigan. He was in her house at various times of the day, knew that she was married, and often saw her husband at the house. However, he hid in the attic or basement and was never seen by Mr. Atkinson. Near the end of October, defendant lost his job and returned to Michigan to work. He saw Karolyn three times in November and on several occasions in December. The last time prior to January 3, 1974, was on December 21, 1973.

Defendant testified that he discussed marriage with Karolyn but did not agree to marry her although he led her to believe he would. He had decided against marrying her by December 21 or 22, 1973. He reached this decision because Karolyn had first told him she had never had any affairs, but when he came to Waukegan the last week in November, she admitted having "lots of affairs." He decided to tell her the decision on January 3. He purchased a one-way ticket from Detroit to Chicago and was met at the airport on the morning of January 3 by Karolyn Atkinson and her 2-year-old daughter. After arriving at Karolyn's home, they made love. During the afternoon, while Karolyn was getting dressed, he played the organ in the front room. He removed a hunting knife from the cabinet and told Karolyn he was going to take it to Michigan to add to his collection. On a previous occasion he had taken four knives and a gun from the cabinet with Karolyn's permission. He then testified that after Karolyn left to pick up her husband he remained in the basement until after Atkinson returned. He related that Karolyn came down several times to fold clothes and get some towels. Later he fell asleep. When he woke up, it was dark outside. He became alarmed and decided to go outside and then downtown to call Karolyn to see what was happening. As he was going toward the stairs, he made a lot of noise by running into something. He could hear loud excited voices upstairs so he decided to get out while he could. He made it to the first landing of stairs before the lights in the basement came on, the door at the top of the stairs opened, and he saw Clifford Atkinson standing there. Clifford Atkinson knocked the defendant down the stairs and stopped his attempt to leave. Atkinson yelled for Karolyn to bring a gun. Defendant remembered the knife he was wearing on his belt, broke free, told Atkinson he had a knife, and again tried to leave, but Atkinson grabbed him in a bear hug. Defendant then reached for the knife; Atkinson tried to shove it into him. As they continued to struggle, he noticed Karolyn standing at the foot of the stairs; Atkinson told her to shoot defendant. Karolyn identified him as Chris Heflin and told her husband to let him go. Atkinson again told his wife to shoot the defendant. A shot was fired, hitting Atkinson who said "You shot me damn it, shoot him."

The defendant saw Karolyn pointing a gun at him; Atkinson yelled at

Karolyn to shoot the defendant "or else you're next." Defendant told Karolyn to take the baby and go next door. He and Atkinson were rolling on the floor when he heard a second shot. The fighting went on for 5 or 10 seconds and then Clifford Atkinson became still. Defendant rolled Atkinson off and turned to run to the stairs to get away; Karolyn was standing between him and the stairs; he shoved her up the stairs. When he had almost reached the landing, he collapsed. Then he heard what he recognized as the death rattle from the basement. He went downstairs, found that Atkinson was dead, picked up the rifle, went back up the stairs, and told Karolyn that her husband was dead. He had blood on his hands, his green sweater, shoes and pants; he also had a cut on his nose. He returned to the basement to get his briefcase, wearing a pair of kitchen gloves which he picked up to avoid leaving any more prints downstairs. He put the knife and rifle clip in his briefcase. The next day he put his briefcase in the train station locker.

On cross-examination defendant said the letter in which Karolyn Atkinson wrote "there are only eight more days left," referred to the date on which he would come to Chicago and he and Karolyn would have their own Christmas and New Year's party. When Karolyn wrote on November 19, 1973, that she did not know how long she was expected to stay in mourning, defendant explained she was referring to the time they expected his mother to die. When he wrote of retiring Mrs. Atkinson's husband permanently, he was not referring to death or injury but to sex. When asked why he had lied to the police when he told them that it was the deceased rather than Karolyn who had the gun, defendant said it was to protect the woman who had saved his life.

One of the girls whom defendant had said he was dating testified that defendant called her and told her he was leaving on January 3 to fly to Chicago but made dates with her for January 4 and 5. Another of defendant's witnesses testified that defendant told him in December that he had plans of establishing a permanent residence in Michigan and of breaking up with Karolyn. The witness also testified that defendant began making arrangements to buy a trailer in Michigan in December and paid a down payment. He was to move in some time after New Year's.

In rebuttal the State called Arthur Atkinson, Clifford Atkinson's brother, who testified that he was at Clifford's home on January 5, 1974, that he had tried to play the organ at this time, but that it didn't work. He said that as far as he knew, the organ had never worked properly. He had not tried to play the organ on the night of January 3, 1974, when he came to the house.

Officer Sroka testified in rebuttal that defendant told him he was wearing a green sweat shirt on the 3rd which was later found in the upstairs bedroom of the Atkinson house and identified by defendant. The

officer also testified that after his arrest, defendant took off the pants he was wearing and stated there were blood stains on them which he had tried washing off with soap. The officer further testified that he had observed defendant's physical condition on January 4 and did not observe any marks or bruises except for a cut on his nose and a 3-inch long red mark on his chest.

Michael Johnson, a police chemist, testified that he had examined the defendant's pants and had found blood.

Defendant first argues that the evidence is insufficient to prove beyond a reasonable doubt that defendant committed the crime of murder. He argues that the substance of the statements of both Karolyn Atkinson and defendant, as testified to by the police officers, and the defendant's testimony clearly established that it was Karolyn, and not the defendant, who shot and killed the victim. He contends that the only evidence to show that defendant was guilty on an accountability theory was in the letters which were not incriminating except by unreasonable inferences. He argues that the letters, in effect, show that Karolyn Atkinson engaged in "wishful thinking" about a marriage with defendant but that it was equally clear that defendant did not plan the killing since he did not want to be pressured into a marriage.

We agree, however, with the State that there was sufficient credible evidence from which the jury could find defendant guilty of murder by accountability. Circumstances may show that there is a common design to do an unlawful act to which all assent; whatever is done by one is then the act of all. (See *People v. McClindon*, 54 Ill. 2d 546, 549-50 (1973); *People v. Washington*, 26 Ill. 2d 207, 209 (1962); *People v. Thicksten*, 14 Ill. 2d 132, 134-35 (1958).) A jury is not compelled to accept the defendant's account of what happened at the time of a crime but may properly consider the surrounding circumstances and the probability or improbability of defendant's story. *People v. Wiggins*, 12 Ill. 2d 418, 423-24 (1957).

The letters and accompanying circumstances permitted the jury to conclude that defendant participated in a common design and purpose to cause the death of Clifford Atkinson without drawing unreasonable inferences from the letters. The evidence demonstrates that the defendant and Karolyn Atkinson met on the 21st of September, 1973; that the romance quickly heated, with great significance being placed on the 21st day of a month; and that the couple wrote letters in which reference was made to Karolyn's mourning and Clifford being permanently retired. In addition, the defendant apparently was interested in living in the Atkinsons' new house and knew something about the insurance policy which assured payment of the mortgage in the event of Clifford's death. There were also the references to a wait of 49 days in the letters and the

circumstance that 49 days from the January 3 date of Clifford Atkinson's death would have fallen on the 21st of a month (February).

The jury was not required to accept the explanations of the letters on a theory consistent with innocence. Moreover, the jury could conclude from defendant's letters that he concurred with the plan when he used the phrase, "retiree [*sic*] him permanently," particularly when there was other evidence that defendant referred in conversations with his family to the victim's death in an accident before he was killed.

The jury could also consider the fact that defendant's explanation that he came to Waukegan on January 3 to break up with Karolyn Atkinson and without motivation to share in the insurance proceeds was inherently incredible considering that defendant had a one-way ticket, only $15 in cash, and after his capture expressed his continued love for Karolyn. Nor was the jury required to accept defendant's version of what happened in the Atkinson basement as an accidental meeting in view of various inconsistencies in his statements and testimony. And the jury could also consider the fact that defendant assisted in concealing the crime as bearing on a guilty rather than on an innocent motive.

■■ We conclude that the evidence was sufficient to convict defendant of murder by accountability beyond a reasonable doubt.

Defendant further argues that the trial court erred in denying his motion to suppress the correspondence between himself and Mrs. Atkinson on the ground the letters were taken from defendant's control without a warrant by persons acting at the request of the police.

At the hearing Jon Heflin was called as a witness by the State. He testified that he was defendant's brother, that defendant had lived in his house in Michigan for a 5- to-6-week period just prior to Halloween in 1973, and that after this period defendant went to live in the home of his cousin, Tim Nichols, in another town in Michigan. He said that defendant paid rent to him and to his cousin. He testified that he drove to the Waukegan police station on January 7, 1974. He was informed of the arrest of his brother and Mrs. Atkinson. One of the officers asked Jon Heflin about the correspondence between his brother and Mrs. Atkinson and asked if Heflin would get the letters for him. He testified that following this, the defendant asked him to pick up his car at the airport, collect his personal belongings, and take them over to Jon's house for storage. Defendant made no mention of any correspondence, and Jon Heflin testified that he did not mention the request by the police officers for the letters. Jon Heflin received his brother's car keys and parking ticket for the car which had been left at the Detroit airport from the Waukegan Police Department. Upon returning to Michigan, he gathered together defendant's belongings which were in Jon Heflin's home, including various letters that were found in the kitchen, basement, the

closet in the room that defendant sometimes shared with one of the Heflin children, and in other closets which were shared.

Next, Jon took his brother's car from the airport to his house and removed letters from the transmission hump, a wastebasket type carrier, and the glove box. He then went to Nichols' house and removed clothes, letters and other belongings of the defendant from a bedroom. He testified he could not distinguish in any way which letters or postcards came from which location. On January 11, 1974, one of the police officers in Waukegan called Jon and asked him for the letters. Jon and his wife gathered them together and mailed them to the officer on January 14, 1974. A second group of letters was found later and mailed to the officer on January 18, 1974. The Heflins stated that in mailing the letters, they were complying with the request of the Waukegan Police, but they also testified that they were following the direction of defendant's counsel who advised them to turn the letters over to the police in response to their request since counsel believed that the State would be able to see them after a discovery order in any event.

The defendant testified at the suppression hearing that he did not request his brother to gather or store any other personal belongings except to pick up the car from the Detroit airport. He said he told his brother to ask Nichols to move defendant's things to the basement in case Nichols wanted to rent out the room. It was stipulated that no search warrant was issued.

The court denied the suppression motion, ruling that the police were not acting unreasonably in asking Jon Heflin and his wife to acquire the correspondence. Some of the letters were subsequently admitted into evidence at trial and read to the jury. It appears from the record that People's Exhibit No. 30 (the "I will retiree [*sic*] him permanently" letter) was not included in the letters transmitted to the police by Jon and Milton Sue Heflin. This letter was discovered in Karolyn Atkinson's home the day after the offense by her sister-in-law, Donna Atkinson, who turned it over to the police.

■■■ The burden of proving that a search and seizure is unlawful as a product of unlawful police activity is upon the defendant who moves to suppress the evidence. (Ill. Rev. Stat. 1973, ch. 38, par. 114—12(b). See *People v. Griffin*, 18 Ill. App. 3d 873, 876 (1974).) Defendant did not sustain this burden as we view the record. Evidence seized by a person who does not act as an instrument or agent of the police is not within Fourth Amendment exclusionary rules. (*Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, 2049 (1971).) Thus "[e]vidence which would be inadmissible if seized by the police is admissible if seized by some non-police related third-party." (*People v. Nunn*, 55 Ill. 2d 344, 353-54 (1973); *Gindrat v. People*, 138 Ill. 103, 110-11 (1891).) Where the

State does not invade a defendant's expectation and right of privacy admission of letters is proper. (See *People v. Harden*, 6 Ill. App. 3d 172, 176 (1972).) The trial court could properly conclude that the correspondence to defendant was seized by Jon Heflin and his wife acting at the direction of defendant rather than the police. The evidence shows that the letters were turned over only after consultation with defendant's attorney. And there is no evidence of overbearing by the police.

Even if it could be said that a search by the police was involved, there was consent by the co-occupants of the Jon Heflin home where many of the letters were found in jointly used areas with no reasonable expectation of privacy. (See *United States v. Matlock*, 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988, 992-93 (1974). See also *People v. Richardson*, 60 Ill. 2d 189, 194 (1975); *People v. Stacey*, 58 Ill. 2d 83, 86-89 (1974).) The letters found in defendant's car, which was in his brother's control after his arrest are similarly cases of joint authority. In addition, there is no suggestion that the police knew that letters were being taken from the car or the room in the Nichols' home.

Defendant next claims that the court's refusal to answer questions forwarded by the jury during its deliberations was error. One of the questions was a request to see a floor plan of the basement of the Atkinson house or to view the house and the basement. Both the State's Attorney and the counsel for defendant agreed that there was no floor plan available and that a view of the house would be improper. The court in its discretion refused the request.

The second question the jury asked was the minimum time necessary to acquire a divorce in Illinois. Defense counsel suggested to the court that they be advised of a 30-day period. However, the State objected to what it considered an attempt to put in additional evidence and the court in its discretion stated that it declined to answer the question.

The next issue raised by the defendant essentially involves the following question submitted by the jury:

"Will you please rephrase the definition of legal responsibility. We are in disagreement concerning intent to promote or facilitate is a necessary condition. [Sic.]"

The jury had been given IPI No. 7.02, the issues instruction on murder, modified by the addition of the italicized language as follows:

"To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant, *or a person for whose conduct the defendant is legally responsible,* performed the acts which caused the death of Clifford Atkinson.

Second: That when the defendant, *or a person for whose conduct the defendant is legally responsible,* did so, he *or a person*

*for whose conduct he is legally responsible,* intended to kill or do great bodily harm to Clifford Atkinson, or he *or a person for whose conduct he is legally responsible,* knew that his act would cause death or great bodily harm to Clifford Atkinson, or he *or a person for whose conduct he is legally responsible,* knew that his acts created a strong probability of death or great bodily harm to Clifford Atkinson. * * * " (Emphasis added.)

The jury was also given the following instruction defining responsibility:

"A person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime." IPI Criminal No. 5.03.

■■ Defense counsel argued to the trial court that the jury should be advised that intent to promote or facilitate is a necessary condition for a person to be legally responsible for the conduct of another person. He repeated the argument that he had made at the conference on instructions that there was a grave danger that the jury would confuse motions or actions brought on by a love relationship with actions brought on by a desire and intent to commit the crime. The State's Attorney argued that the court should answer by stating that the jury had heard the evidence and had received the instruction and should base its decision on the evidence and the law. The court thereupon advised the jury that in its discretion it declined to answer the question.

The defendant has submitted no authority to support his view that the court must further explain its instructions to the jury, and we know of none. The judge acted properly in responding to the jurors' inquiries under all the circumstances.

■■ Defendant also contends that he was denied a fair trial by improper argument of the State's Attorney. The principal claim of error is based on the State's argument that even if they found that Karolyn Atkinson did in fact pull the trigger, the defendant was still guilty of murder because he applied psychological pressure to her causing her to shoot her husband instead of the defendant. Defendant characterizes the argument as prejudicially creating the inference that the defendant could be held accountable for Atkinson's murder without proof that he intended either to promote or facilitate the commission of the offense. We find no merit in this argument since the record shows that the court promptly told the jury to disregard the State's argument: "So again psychologically, he, the defendant, is aiding her in pulling that trigger" by the following statement:

"THE COURT: Disregard the fact, unless he was aiding and abetting her to kill."

The other instances claimed to be improper comments were not substantially prejudicial, were promptly remedied by the court upon objection or made without objection.

Defendant next contends that the trial court erred in denying his motion for a mistrial based on the testimony of Alfred Atkinson, the father of the deceased. Mr. Atkinson was the next to the last witness called by the State. Over defense counsel's objection the witness was permitted to testify that deceased was 36 years old, had three female children, and was married to Karolyn Atkinson. He also testified that Clifford and Karolyn were building another home which was expected to be completed in April 1974.

Mr. Atkinson was shown a photograph of Karolyn with the defendant and identified his daughter-in-law and the other person as the defendant whom he saw in court. He was then shown a picture of his own son lying dead on the basement floor and asked who that was a photograph of. He began to cry. Defense counsel offered to stipulate that it was his son in the photograph. On further examination, Mr. Atkinson testified that he had last seen his son on January 2, that he was in good health, and that the next time he saw him was in the casket at the funeral home. Following cross-examination the witness, on stepping down from the stand, apologized to the court and the jury for his emotion. The defendant's motion for a mistrial was denied.

The defendant argues that the testimony of the witness was deliberately elicited by the State for the sole purpose of provoking the prejudicial emotional reaction. It notes the circumstance that the defendant had sought a ruling as to the father's testimony prior to trial and that the prosecutor represented that the testimony was essential to establish the fact of the deceased's marriage and to describe physical aspects of the home of the son which the father had built, but that at trial no questions were asked about the home. Defendant also argues that the questions as to the decedent's family had no relevance and were asked solely to create passion.

The State argues that the witness testified to relevant facts including the identification of the victim, the victim's death, and the building of a home due to be completed by April 1, 1974.

The State has the right to prove every element of the crime and is not obliged to stipulate evidence. (*People v. Hudson*, 46 Ill. 2d 177, 197 (1970).) The fact that a witness becomes emotionally distraught during his testimony does not of itself constitute prejudicial error requiring a reversal. (*People v. Hudson*, at 197.) However, evidence that a deceased left a family which has no relevance to the guilt of the accused and is

presented as if it is material, rather than elicited incidentally, is error. (See *People v. Dukes*, 12 Ill. 2d 334, 340 (1957); *People v. Bernette*, 30 Ill. 2d 359, 372 (1964).) In certain instances such testimony may be considered to be within the doctrine of harmless error. *People v. Jordan*, 38 Ill. 2d 83, 91-92 (1967).

The reference to the deceased's family was brief and was not mentioned in the prosecutor's argument to the jury. It cannot be said, on the whole record, to have had any significant effect on the conviction of the defendant. We conclude that the error was harmless beyond a reasonable doubt. *People v. Hudson*, at 197; *People v. Jordan*, at 92; *People v. White*, 10 Ill. App. 3d 914, 918 (1973).

■■ The showing to the father of the photograph of his son's dead body, which he had apparently not seen before, for the alleged purpose of identifying him was, we think, unnecessary and is not condoned. However, the fact that the father was emotional when testifying to his son's death is not here a sufficient basis for a new trial. *People v. Hudson*, 46 Ill. 2d 177 (1970).

■■ Defendant alternatively contends that the trial court abused its discretion in imposing a sentence of 30 to 60 years. Defendant argues that neither the character of the defendant nor the evidence of the offense warrant the sentencing of defendant to more than the minimum term of 14 years (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)).

The record, however, supports the sentence considering the nature of the crime and the circumstances under which it was found to have been committed.

We, therefore, affirm the judgment.

Affirmed.

GUILD, P. J., and HALLETT, J., concur.