No. 98,403

STATE OF KANSAS, *Appellee*, v. TYRONE LEAPER, *Appellant*.

(238 P.3d 266)

Opinion filed September 3, 2010.

*Heather R. Cessna*, of Kansas Appellate Defender Office, argued the cause, and *Sarah Morrison*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Jerome A. Gorman*, district attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Tyrone Leaper was convicted of second-degree murder for fatally shooting Christopher Lovitch and received a sentence of 620 months' imprisonment. The Court of Appeals affirmed. We granted Leaper's petition for review; our jurisdiction is under K.S.A. 20-3018(b).

Leaper's issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in denying Leaper's motion for a mistrial? No.
2. Did the district court err in its procedures for the jury's use of transcripts during its deliberations? Not preserved for review.
3. Did cumulative error deny Leaper a fair trial? No.
4. Did the district court improperly sentence Leaper to a higher sentence without submitting his criminal history score to the jury? No.

Accordingly, we affirm the decisions of the Court of Appeals and the district court.

## FACTS

On May 12, 2006, Tyrone Leaper left work and went to his sister's apartment. Upon arriving, Leaper saw his brother, Roderick, sitting outside with his girlfriend's brother, Christopher Lovitch. When Leaper attempted to enter the apartment, Lovitch ac-

cused him of being "in violation" and attacked him. They ended up on the porch of neighbor Georgetta Laster, where the fight was broken up.

After the fight, Leaper went into his sister's apartment to tend to his bleeding eye. Leaper testified that he called a friend named Crystal to pick him up, but Roderick later told police that he heard Leaper ask someone on the phone to "come through." Leaper left the apartment, but once outside the door, Lovitch attacked him again.

Laster watched this second fight from her nearby apartment. She testified that at some point Leaper struck Lovitch with a wooden pole. After being hit, Lovitch regained his composure and threw Leaper against an exterior apartment wall. Laster then called 911. While on the phone, Laster heard a gunshot. Her mother, Nina Jensen, and her son, I.M.H., were inside her apartment and watched the second fight. Both testified that they saw Leaper shoot Lovitch from the top of a staircase overlooking the courtyard.

Leaper denied shooting Lovitch. He testified that he fell to the ground after Lovitch slammed him against the wall. While on the ground, Leaper heard someone say "get off my cousin" and realized that his cousin Travis was present. After hearing the gunshot, Leaper ran to a parking lot in the opposite direction from the staircase where Jensen and I.M.H. placed him. Leaper testified that his cousin Travis, and not Leaper, was at the top of the stairs when the shot was fired.

Leaper's brother Roderick testified that during the first fight between Leaper and Lovitch, Travis had the pole and was "trying to jump in the fight." Roderick also testified that during the second fight, Leaper was on the ground near Laster's apartment when Roderick went inside to call his girlfriend, Misty Murphy. Murphy is the mother of 3 of Roderick's children and is also Lovitch's sister. While on the phone, Roderick heard the gunshot. He admitted seeing cousin Travis at the apartment with a gun but denied seeing who actually fired the shot. According to Roderick, Lovitch walked into the apartment soon after the gunshot and started talking to him. Lovitch collapsed without identifying the shooter.

Murphy testified contrary to the testimony of her boyfriend, Roderick. According to Murphy, Roderick told her while they were on the phone that Leaper shot Lovitch.

Lovitch died from a single gunshot to his chest. Based upon the bullet entry wound, both the pathologist and crime scene investigator determined that the shot was fired from a higher level than Lovitch. Officer Bruce Cobbins testified that Lovitch was shot while inside the apartment screen door, looking up toward the hill. No gun or shell casing was ever recovered from the scene.

Although Roderick testified that Travis had a gun at the scene, he had not mentioned this detail when the police had earlier questioned him. To point out this discrepancy, the prosecutor handed him a copy of his transcribed police statement. When Roderick expressed difficulty in reading it, the State offered to play the audio tape of his interview. The judge excused the jury, and Roderick listened to his recorded interview.

When the jury returned, the State continued Roderick's cross-examination and eventually offered the tape into evidence. The defense objected, and the judge took the matter under advisement. Following the testimony of Roderick and another witness and the jury's departure for the day, the judge asked for the tape. However, the parties were unable to find it. During their search, they discussed whether Roderick had taken it from the courtroom, with the judge suggesting that Roderick "may have put it in his pocket." The bailiff then entered the courtroom and the following colloquy occurred:

"Bailiff: Are you looking for the tape?
"Court: Yes.
"Bailiff: One of the jurors told me that Roderick took it.
"Court: Oh.
"Bailiff: Put it in his pocket.
"Court: Well, I will need to- -
"Bailiff: They said as he left, he grabbed it, put it in his pocket."

When Roderick was brought back to the courtroom, he denied taking the tape. He encouraged and voluntarily submitted to a search of his person, but the tape was not found. The court concluded:

"Court: Well, I don't—if he did [take it], he doesn't have it now in any event and I could not tell you that he, in fact, took it even though one of the jurors may have thought he did. I don't know. I don't know. But that's neither here nor there."

The next morning, the defense filed a motion for a mistrial, claiming that a juror's observation of Roderick taking the tape prejudiced Leaper and that no instruction could cure the problem. The defense argued that if no mistrial was to be declared, then the court should poll the jury to determine if any other juror saw anything. The motion stated in relevant part:

"6. That the tape was missing and the bailiff informed the court and the parties that one of the jurors told her that the witness had taken it and put it in his[] pocket when he left the witness stand.

. . . .

"9. That the fact that the juror saw what happened prejudices the Defendant.

"10. The Defendant did not take the tape, but the jury may decide this testimony of the witness not based on what he said but what he did and there is no curative instruction that can be given.

"11. That the Court should grant a mistrial immediately or poll the jury to determine if any other juror saw anything.

"12. That [K.S.A.] 22-3423(1)(c) contemplates granting a mistrial when prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the Defendant or the prosecution.

"13. That this incident relates to the testimony of a witness who identified someone else at the scene engaged in hitting the victim and carrying a weapon and who testified that he never saw the Defendant with any weapon, gun or stick, and that the Defendant was badly beaten by the victim."

At the hearing on the mistrial motion, Leaper emphasized that the jury had been told by the court that it was to decide the case on the evidence presented, *i.e.*, not the actions of a witness leaving the stand. He asked that at a minimum, the court bring in the reporting juror to find out exactly what was seen and to determine whether other jurors had seen anything. The State responded that "it's no different than the jury can judge a witness' demeanor in determining their credibility."

The judge denied the motion, explaining that the jury was to determine the credibility of witnesses. He acknowledged the "one known fact": that one juror had informed the bailiff that the witness had taken the tape. But the judge opined that Leaper made many suppositions as to what the jury saw and heard. He further stated:

"I can see no substantial criminal right of the defendant being interfered with by a witness's behavior on the witness stand." The judge concluded by noting that even if Roderick had taken the tape, it was common for witnesses to inadvertently take a piece of evidence off the stand, as police officers "have been known to do this exact same thing."

The jury ultimately found Leaper guilty of second-degree murder. Leaper filed a motion for a new trial, raising several issues, including the issue involving the juror's comments to the bailiff. He again emphasized that Roderick was the only exculpatory witness, and his important testimony could have been totally rejected by the jury solely because of his conduct that was unrelated to the issues of the trial. Leaper essentially argued that the court's failure to take any action beyond hearing the arguments denied his right to a fair trial. The motion provided in relevant part:

"4. That the Court erred in failing to grant a mistrial when the jury [a juror] notified the bailiff that they saw a witness take an offered exhibit . . . with him when he left the witness stand. The Court failed to protect the Defendant's right to a fair and impartial jury when it failed to bring in the juror who made the report and failed to communicate with any other jurors as to whether or not they had seen him take it as well. . . . The jury had already been excused but they may have seen what happened before they left the building. At least one saw him take it. . . . *Defendant filed a written Motion for Mistrial based on the jury observing something not related to the trial which might impact on the Defendant's right to a fair trial. . . . This witness was the only exculpatory witness that had testified to that point and the Defendant is concerned that the jury would decide whether or not to believe him not based on his testimony but on him taking an exhibit [from] the witness stand. . . .* The proper procedure would have been to bring the juror or jurors in who saw him take the tape and have them answer if they could still be fair to the Defendant based on the conduct of his brother[] in taking something from the court. The court told the Defendant that he was just speculating about whether it affected the jury and that is why the Defendant asked that the juror or jurors be brought in for questioning. The [juror] is the one who informed the Court that the witness had taken the exhibit." (Emphasis added.)

The judge denied the motion for new trial, finding that no prejudice occurred that would have affected Leaper's substantial criminal rights. On the tape issue, he held that "based upon the evidence against the defendant in this case, the eyewitness testimony, et cetera, I doubt if it [the incident] had any effect whatsoever

against the defendant." The judge later sentenced Leaper to 620 months' imprisonment.

The Court of Appeals affirmed Leaper's conviction and sentence. Judge Malone concurred in the result but disagreed with the majority's analysis of Leaper's motion for a mistrial. *State v. Leaper*, 40 Kan. App. 2d 902, 196 P.3d 949 (2008). We granted Leaper's petition for review.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The district court did not err in denying Leaper's motion for a mistrial.*

### Parties' arguments

Leaper contends the district court judge erred in denying his motion for a mistrial. He claims that (1) the judge's failure to investigate the extent to which the jury was aware of, and possibly considered, Roderick's alleged taking of the tape, coupled with (2) the judge's failure to instruct the jury to disregard the event, resulted in substantial prejudice to his rights. In short, he was denied his right to a trial by an impartial jury because the jury may have improperly considered matters outside of the evidence admitted at trial.

The State responds that "[t]he conduct of a witness on the witness stand under oath is something for the jury to consider in order to determine the credibility of the witness." The State further claims that Leaper never proved how this event would affect him and therefore his rights were not prejudiced.

### Court of Appeals' decision

The majority opinion for the panel appeared to analyze Leaper's claim as possible juror misconduct. It concluded that no misconduct occurred because Roderick's actions were capable of being observed by the entire jury, *i.e.*, this was not the independent act of a single juror. See, *e.g.*, *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1993) (one juror spoke with his daughter about the ability of the plaintiff's son to speak Spanish, which was an issue in the case). The majority denied that Roderick's tape taking constituted

extraneous or extrinsic evidence, holding that it was instead witness demeanor evidence appropriate for the jury's consideration. See Black's Law Dictionary 463, 596 (8th ed. 2004) (defining "demeanor evidence" as the "behavior and appearance of a witness on the witness stand"). It also concluded that Leaper failed to show how the juror's observation would have affected the outcome of the trial because the evidence of Leaper's guilt was overwhelming.

In Judge Malone's concurrence, he concluded that the majority was wrong to analyze Leaper's claim in terms of juror misconduct. Instead, the proper approach was to determine whether prejudicial conduct in the courtroom made it impossible for Leaper to receive a fair trial. He further concluded that Roderick's alleged taking of the tape was not proper for the jury's consideration as a witness' demeanor. Rather, it was extrinsic evidence and therefore improper. See Black's Law Dictionary 597 (8th ed. 2004) (extrinsic evidence is that which is not legitimately before the court). According to Judge Malone, the district judge therefore should have instructed the juror to disregard this conduct. He opined the judge abused his discretion by failing to at least question the juror to discover what the juror knew, how the information affected the juror, and whether the juror shared this information with other jury members. Nevertheless, he concluded that given the amount of evidence against Leaper, these failures did not substantially prejudice Leaper's right to a fair trial.

## Standard of Review

The Kansas mistrial statute, K.S.A. 22-3423(1), states in relevant part:

"The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because:

. . . .

"(c) prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

We have elaborated:

"As a general rule, a motion for a mistrial is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving

that his or her substantial rights to a fair trial were prejudiced." *State v. Angelo*, 287 Kan. 262, 283, Syl. ¶ 16, 197 P.3d 337 (2008) (citing *State v. White*, 284 Kan. 333, 161 P.3d 208 [2007]).

" 'It is necessary when justice so requires to declare a mistrial where there is some fundamental failure of the proceeding. When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial.' " *Angelo*, 287 Kan. at 283-84.

## Discussion

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a fair and impartial jury trial. The failure to accord a defendant a fair trial by impartial and indifferent jurors "violates even the minimal standards of due process." *Morgan v. Illinois*, 504 U.S. 719, 727, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). The Supreme Court has explained that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982). We synthesized most of these principles in *State v. Cady*, 248 Kan. 743, 754, 811 P.2d 1130 (1991):

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. A juror's verdict must be based upon the evidence developed at the trial of a criminal prosecution."

See PIK Crim. 3d 51.04 (In fact finding, a jury is only permitted to consider admissions or stipulations of parties and exhibits and testimony admitted into evidence.). Indeed, "[a] party is denied the right to a fair trial when a juror introduces evidence on material issues of fact to the jury during its deliberations." *Saucedo v. Winger*, 252 Kan. at 733.

In the exercise of the jury's duty, however, it is permitted to determine the weight and credibility to be given to the testimony of each witness. PIK Crim. 3d 52.09. And the jury may consider extrinsic evidence concerning a witness' conduct *if* introduced into evidence. See K.S.A. 60-420.

The panel's majority found no jury misconduct, opining that Roderick's action was part of his demeanor and therefore appropriate for the jury to consider. Judge Malone opined the action was not demonstrating demeanor because Roderick took the tape and put it in his pocket as he left the witness stand, not while he was on the stand. He emphasized the definition of demeanor evidence found in Black's Law Dictionary: the "behavior and appearance of a witness *on the witness stand.*" (Emphasis added.) Accordingly, this piece of evidence was extrinsic.

We agree that the issue is not jury misconduct. More specifically, a juror saw something in the courtroom and thought it sufficiently unique to dutifully report it to the bailiff. But we disagree that the dispositive question is whether Roderick's conduct occurred on or off of the witness stand. Rather, the question is whether Leaper was denied a fair trial by the conduct of Roderick and by the responsive action, or lack of such action, of the trial judge. The following cases are illustrative.

Numerous cases involve mistrial motions based upon a witness' conduct before physically being on the stand. For example, in *State v. Crawford*, 672 So. 2d 197 (La. App. 1996), the prosecutor left the courtroom to retrieve the State's first witness. He returned with the rape victim, who was crying. The trial judge immediately called for a recess. Defense counsel then moved for a new trial, *i.e.*, mistrial, which was denied. The witness returned and was advised to maintain her composure. After the jury returned, she testified without crying. The court then instructed the jury that their judgment should not be influenced by the visible manifestations of physical upset exhibited by the victim or any other witness. On appeal, the court upheld the denial of motion for a new trial.

Other cases involve mistrials based upon a witness' conduct, *e.g.*, "demeanor" while on the stand but before actually testifying. The case of *Cooper v. State*, 72 Tex. Crim. 645, 163 S.W. 424 (1914), involves witness conduct both before taking the stand and while on the stand but before actually testifying. When the seduction victim was called to testify, "she knelt in the presence of the jury and offered up . . . prayer." 72 Tex. Crim. at 646. According to the appellate court, "the [trial] court did all in his power to remove

the effect of this scene, recognizing, as we do, that it was highly improper. But after being cautioned, the young lady took her seat on the witness stand, and again uttered a prayer." 72 Tex. Crim. at 646. "The court, as well as counsel, again remonstrated, and the court again instructed the jury not to consider this incident in their deliberations." 72 Tex. Crim. at 646. Based upon the prayer episode and others, the case was reversed and remanded for a new trial.

Of a similar nature, but more recent vintage, is *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609 (1990), where the murder victim's mother was called to testify:

"[She] spoke only Korean and testified through an interpreter. Before she began to testify, the interpreter informed the court that [she] wanted 'to pray by herself just a few moments because she can't say anything.' No objection was made. [She] then stood and began an 'emotional outburst' in Korean, in a loud and angry tone of voice, turning her eyes to the defendant. Although neither the court nor the jury could understand her words, which were not translated or recorded, the court promptly instructed the jury that her words were not in evidence and were 'not be considered part of the case.' The defense moved for a mistrial and the court denied the motion." 240 Va. at 94.

This event, and others, combined to form defendant's appellate argument that the mistrial should have been granted. The denial was upheld because the court had given prompt and appropriate curative instructions. 240 Va. at 95.

Other cases involve mistrial motions based upon a witness' conduct, *e.g.*, "demeanor" while actually testifying. The pure conduct case of *State v. Burgess*, 800 S.W.2d 743 (Mo. 1990), is on point. There, the 16-year-old victim was being cross-examined about the rape and sodomy committed by her step-father. She was handed a photograph of herself that she had given to him inscribed with her love. Without speaking, she then tore the photograph in half. The defendant had entered the photograph into evidence to support his claim that the victim cared for him. He argued she tore it to lead the jury to believe she did not care for him at all. Although no mistrial had been requested and the specific issue had not been raised in the motion for new trial, the Missouri Supreme Court entertained the mistrial issue on appeal. Rather than summarily

rejecting the claim because the event was proper witness demeanor for the jury to consider, the Missouri Supreme Court proceeded to analyze the argument. It concluded the trial court had not abused its discretion in failing to declare a mistrial because no evidence showed that such a failure constituted manifest injustice.

Similarly, in *Duncan v. State*, 256 Ga. 391, 349 S.E.2d 699 (1986), the murder victim's mother was being examined by the prosecution. The prosecutor asked if she could identify a picture of her son taken after he was stabbed. As she reached for the picture, she said, " 'Oh my God . . . Give me that.' " 256 Ga. at 392. After defendant moved for a mistrial, the judge removed the jury and told the mother if she did not control herself he would have to declare a mistrial. She replied that she would. When the jury returned, the judge instructed it to ignore the outburst. He also instructed on the presumption of innocence and the burden of proof in a criminal trial. The Georgia Supreme Court did not simply reject the mistrial claim because the event was proper witness demeanor for the jury to consider. Instead it held that the judge's actions were appropriate and there was no abuse of discretion in denying defendant's motion.

Other examples of witness stand conduct have included crying, unprovoked verbal outbursts, trembling and falling to the floor, and gasping aloud. See, *e.g.*, *State v. Worthen*, 550 So. 2d 399 (La. App. 1989) (mistrial denied when rape victim on cross-examination made unprovoked verbal outburst and began crying; appellate court cited the strong admonition to the jury in affirming the conviction and the denial of mistrial motion); *People v. Heflin*, 40 Ill. App. 3d 635, 351 N.E.2d 594 (1976) (mistrial denied when father of murder victim cried on stand upon examining photo of son lying dead on basement floor; denial upheld on appeal); *Miller v. State*, 162 Ga. App. 730, 292 S.E.2d 102 (1982) (mistrial denied when rape victim on cross-examination began trembling and fell to the floor; appellate court cited timely corrective action in affirming conviction and denial of mistrial motion as within court's discretion), *rev'd on other grounds by Matthews v. State*, 268 Ga. 798, 493 S.E.2d 136 (1997); *State v. Oveross*, 18 Or. App. 300, 525 P.2d 176 (1974) (67-year-old victim of an attempted murder was testi-

fying; when handed a close-up photograph of her in hospital, she gasped upon seeing her shaved head and sutured head wounds; motion for mistrial denied and upheld on appeal as no abuse of discretion).

In a similar vein, the eyewitness to fatal shootings was directed to leave the stand during her testimony and to identify a defendant by touching him in *People v. Jean-Pierre*, 169 A.D.2d 932, 564 N.Y.S.2d 831 (1991). She instead identified him with repeated blows, which produced "unusual and untoward reactions." 169 A.D.2d at 933. Counsel for all defendants moved for a mistrial, which was denied. The appellate court affirmed, holding that the defendant failed to demonstrate how these actions deprived him of a fair trial.

Numerous cases involve mistrial motions based upon a witness' conduct immediately after testifying. One vivid example is *Berryhill v. State*, 726 So. 2d 297 (Ala. Crim. App. 1998). There, the murder victim's daughter, "after testifying and in full view of the jury, allegedly walked behind [defendant], made a motion with her finger 'like a gun,' pointed her finger at [defendant's] head, and mouthed the word 'pow.'" 726 So. 2d at 303. Defendant moved for a mistrial, which was denied. The appellate court affirmed because of curative action taken by the trial court. More typical is *King v. State*, 298 Ark. 476, 769 S.W.2d 407 (1989), where the rape victim collapsed in the courtroom after completing her testimony. The judge denied the defendant's motion for mistrial. He admonished the jury to render its verdict on the basis of the testimony and the instructions, to put aside prejudice and sympathy, and specifically directed the jurors not to consider the witness' collapse in their deliberations. The appellate court affirmed, holding the admonition was as effective as words can be and that no prejudice had been demonstrated by defendant.

Based upon these cases and numerous others that they represent, we conclude that something more was present here than simply witness demeanor appropriate for the jury to consider—regardless of whether it happened on the stand, off the stand, or while leaving it. We most certainly reject the trial court's general conclusion that "I can see no substantial criminal right of the de-

fendant being interfered with by a witness's behavior on the witness stand."

We also reject the position of the panel majority that there can be no abuse of judicial discretion for failing to investigate actions simply because they did not constitute juror misconduct. 40 Kan. App. 2d at 908-09. Instead, we agree with Judge Malone that once Leaper's claim had been brought to the attention of the trial court, the judge had an obligation at least to inquire about what was known to that juror and how, if at all, the information affected the juror. See *Smith v. Phillips*, 455 U.S. at 217 (due process also means a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen); *United States v. Williams*, 809 F.2d 75, 85 (1st Cir. 1986) ("'When a non-frivolous suggestion is made that a jury may be biased or tainted, the district court must make an adequate inquiry into whether the alleged tainting incident occurred and whether it was prejudicial.'").

The case of *State v. Dixon*, 289 Kan. 46, 209 P.3d 675 (2009), is of guidance. There, it came to the trial judge's attention that a juror had seen or heard defendant in leg shackles and had told at least three other jurors about it. As a result, defendant requested a mistrial. The judge then questioned the juror directly, who stated he had heard the defendant coming into the courtroom with shackles and told three other jurors. The judge then asked the juror if the incident would "in any way affect the manner in which you have viewed this case" or "cause you to feel one way or another for or against [defendant's] guilt or innocence." The juror replied "no." 289 Kan. at 53. Without following up with the three other jurors, the judge denied the mistrial motion. But the judge did give the following curative instruction to the entire jury without disclosing the specifics of what had been heard by one and thereby risking possible taint of the others:

" 'Members of the jury, late this morning it came to my attention that one or more of you may have had occasion to observe [Dixon] while coming or going from the courtroom and may have shared information regarding your observations [with] other jurors. I want to make clear to you that the manner in which [Dixon] arrives in the courtroom is not a matter that has any bearing whatsoever on this

proceeding. It makes no difference. You're to draw no inferences from anything that you have seen or heard, and specifically I'm instructing you to disregard in these further proceedings any information with regard to the mode, mechanism of the transport or the appearance of [Dixon] here in any way. Simply put, it's not appropriate to consider those things.' " 289 Kan. at 53.

In affirming the mistrial denial, we pointed out that the juror who heard the defendant in shackles denied that the experience would affect his impartial decision making. We concluded that "although it would have been reassuring for the district judge to have questioned the other jurors, it was not absolutely necessary here. The judge's specific curative admonishment to the entire jury was an excellent alternative to ameliorate any ill effect from a relatively minor incident." 289 Kan. at 62.

The "reassuring" approach referenced in *Dixon* was implemented by the trial court in *Berryhill*, 726 So. 2d 297. There, as mentioned, defendant moved for a mistrial after a witness completed her testimony, walked behind the defendant, made a motion with her finger like a gun, pointed the finger at his head and mouthed the word "pow." The trial court generically asked all the jurors whether they had seen a gesture. Seven jurors responded affirmatively. The other jurors were asked to leave, and the seven remaining were instructed that the incident was highly improper and they were to disregard it and not hold it against the defendant. These jurors were then polled individually to determine if they were able to disregard the incident. After the polling, the court instructed the seven to not discuss the incident with the other jurors. The court again polled the seven to determine if they would remove the incident from deliberations and not hold it against either side. Each responded affirmatively. The appellate court determined the trial court's action cured any prejudicial error that may have occurred.

Here, the trial judge refused to inquire of the juror about the juror's knowledge of Roderick's tape taking and its possible impact on the juror. He also refused to inquire whether other jurors had knowledge of the incident and about the possible impact on them. We therefore agree with Leaper that while he has the burden of showing prejudice, and eventually abuse of judicial discretion in

the denial of his mistrial motion, he is slowed in meeting his burden by the trial court's refusal. And in the absence of a judicial admonition and instruction to any of the jurors, they may mistakenly believe that consideration of Roderick's tape taking was appropriate. *State v. Dixon*, 289 Kan. at 55 (appellate review of denial of mistrial should consider whether limiting instruction was given); *cf. Angelo*, 287 Kan. 262 (mistrial declared only when an event of prejudicial misconduct and damaging effect cannot be removed by admonition and instruction). Moreover, when a juror feels strongly enough about a witness' conduct to report it to the court bailiff, and the judge apparently fails to even acknowledge the report, much less respond to it, the conduct may remain prominent in the juror's mind and he or she may mistakenly place undue emphasis upon it. Leaper makes the valid point that because the juror reported the criminal act of theft—Roderick grabbed the tape and put it in his pocket—the possibility of its negative impact on the jury increases.

Nevertheless, all three judges of the panel agreed that the evidence of Leaper's guilt was overwhelming, *i.e.*, any trial judge error on the issue was harmless. *Cf. State v. Dixon*, 289 Kan. at 55 (appellate review of denial of mistrial should consider whether the evidence improperly admitted would affect the outcome of the trial). More specifically, they point out that Leaper was engaged in a physical fight with Lovitch moments before Lovitch's death; that two neighbors identified Leaper as the shooter; and that police found the neighbors' statements—that Leaper shot Lovitch from the top of a staircase—were consistent with the physical evidence, *i.e.*, the fatal shot was fired from a higher level than Lovitch.

Additionally, the majority concluded that Roderick's taking of the tape would only have contributed to his already negative demeanor and weak credibility: He suggested at trial that Travis was the probable shooter but admitted he never told the police about Travis when they interviewed him on the day of the shooting.

We conclude that the trial judge abused his discretion by failing to investigate the alleged tape taking and by failing to provide the jury with an admonition to disregard. See *State v. Dixon*, 289 Kan.

46. However, we agree with the panel that the error was harmless, *i.e*, it did not affect the outcome of the trial. 289 Kan. 46.

In addition to the evidence cited by the panel, we observe that the defendant-identifying testimony of the two eyewitness neighbors is corroborated by a third independent witness. Roderick's girlfriend and mother of three of his children, Misty Murphy, testified that she was on the phone with Roderick when she heard a gunshot. Roderick then told her that Leaper—his brother—"shot your brother."

As for Roderick's credibility with the jury being damaged by his taking the tape, we agree with the panel's opinion that his veracity was already weak. Despite his girlfriend's testimony about Roderick's contemporaneous identification of his brother as the shooter, Roderick told the jury, "I didn't see no one shoot." And despite his trial testimony that his cousin Travis (1) had a gun (2) at the murder scene, he failed to mention either critical fact to the police immediately after the fatal shooting for which his own brother was rapidly becoming the prime suspect.

Once in front of the jury, Roderick partially explained this particular, critical failure. Before his interview began he had told the detectives about Travis' presence. However, he did not mention this fact during the later taping of the interview simply because the detectives failed to ask him. It is doubtful that trained homicide detectives would have failed to follow up regarding another eyewitness, especially a cousin to Roderick and Leaper. Moreover, Roderick did not explain why he had never told the police, before or during the taped interview, that Travis had a gun at the scene.

Additionally, while in front of the jury, Roderick was unable to recall many of the details he had provided during the taped interview. After Roderick listened to the tape outside the jury's presence to refresh his memory, the State questioned him upon the jury's return. The record reveals he became argumentative and blamed the State, declaring that the prosecutor "want[ed] to twist stuff around" and "make me trying to change my story." His impatience with the State was repeatedly shown. The trial judge, who is in a better position than an appellate court to gauge a witness' demeanor and credibility, denied Leaper's motion for mistrial par-

tially on this basis. He stated that it was "pretty obvious" from Leaper's testimony that "when the State was asking him questions about what happened on the date in question, he repeatedly said he couldn't remember. He didn't want to talk about it. He was through[.] [A]nd then when you [defense counsel] were asking him questions, he could remember all sorts of facts and details that he apparently had not shared with the authorities."

In later denying Leaper's motion for new trial, the judge concluded, "Mr. Leaper was, in effect, a hostile witness. That was evident almost from him being sworn in." Based on the judge's view of Leaper and the remaining evidence, he stated, "I doubt if it [the tape incident] had any effect whatsoever against the defendant."

As part of our analysis, we acknowledge Leaper's argument that Roderick was the only exculpatory witness. As Leaper's motion for mistrial made clear, Roderick was important because he was "a witness who identified someone else [Travis] at the scene engaged in hitting the victim and carrying a weapon" and was someone "who testified that he never saw the defendant with any weapon, gun or stick, and that the defendant was badly beaten by the victim." And we must further acknowledge the possibility that Roderick's important testimony could have been entirely rejected as incredible solely because of his tape-taking conduct on or near the witness stand. Nevertheless, as explained in detail above, Roderick's credibility was independently weak before this conduct, and the evidence supporting Leaper's conviction was strong. Consequently, we hold the error was harmless under all the circumstances of the case.

Issue 2: *The district court did not err in its procedures for the jury's use of transcripts.*

Leaper next argues the district court erred in its procedures for the jury's use of transcripts during its deliberations. The State responds that the Court of Appeals correctly determined that Leaper failed to preserve this argument for appellate review when he failed to object at the lower court. 40 Kan. App. 2d at 911 (citing *State v. Kirtdoll*, 281 Kan. 1138, 1148, 136 P.3d 417 [2006]); see also

*State v. Smith,* 258 Kan. 321, 327, 904 P.2d 999 (1995) (defendant waives his or her right to challenge the district court's response to a jury request by failing to make contemporaneous objection). Under this precedent and the record on appeal, we agree. Consequently, we see no reason to set forth the argument in detail or to further address it.

Issue 3: *Cumulative error did not deny Leaper a fair trial.*

Leaper next argues that cumulative error deprived him of a fair trial. The State responds that no error occurred; but if errors occurred, their accumulation was harmless.

We held in Issue 1 that the district court erred in its treatment of the episode involving Roderick's alleged taking of the cassette tape but that the error was harmless because it did not affect the outcome of the trial. We have held that no other error occurred. Because the presence of one trial error is insufficient to accumulate, we hold that Leaper was not deprived of a fair trial. *State v. Houston,* 289 Kan. 252, Syl. ¶ 14, 213 P.3d 728 (2009).

Issue 4: *The district court did not improperly sentence Leaper.*

Finally, Leaper argues that the district court erred in sentencing him to a higher sentence based upon a criminal history not proved to a jury beyond a reasonable doubt in violation of *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The State responds that the Court of Appeals properly rejected this argument based upon this court's prior rejections of it. See, *e.g., State v. Riojas,* 288 Kan. 379, 388, 204 P.3d 578 (2009); *State v. Fewell,* 286 Kan. 370, 393-96, 184 P.3d 903 (2008); *State v. Storey,* 286 Kan. 7, Syl. ¶ 4, 179 P.3d 1137 (2008). We agree. Consequently, we see no reason to set forth the argument in detail or to further address it.

Affirmed.

\* \* \*

JOHNSON, J., concurring: I concur in the result, but write separately on the mistrial issue. I agree with much of what the majority suggests, *i.e.* that the act of defendant's brother in taking evidence from the witness stand was misconduct in the courtroom; that the observation of that conduct by one of the jurors was likely to be

prejudicial to the credibility of a critical defense witness; and that the trial court abused its discretion by failing to investigate the misconduct's impact on the jury and by failing to appropriately caution or admonish the jury. I would even agree that the nature and extent of the State's evidence can support the majority's finding of harmless error, although, in my view, that determination is an extremely close call.

Where I depart from the majority's reasoning is when it assesses witness credibility to rationalize harmless error. The majority appears to be driven by its agreement with the opinions of the trial judge and the Court of Appeals panel that defendant's brother was just not a very believable trial witness. Perhaps a witness' prior inconsistent statements might be a valid consideration when considering the strength of the State's case in the harmless error analysis. However, a judicial assessment of whether the jury would have believed a defense witness' exculpatory trial testimony is way beyond the purview of appellate review. *Cf. City of Mission Hills v. Sexton*, 284 Kan. 414, 422, 160 P.3d 812 (2007) (in sufficiency of the evidence challenge, appellate court does not reweigh the evidence or pass on the credibility of the witnesses). The right to a fair trial, *i.e.* the guarantee of a fair and impartial process, is not conditioned upon the perceived quality of one's witnesses. We let the jury decide whether to believe a witness.

BEIER and ROSEN, JJ., join in the foregoing concurrence.